| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| Carrissa M. Villalobos<br>PO Box 4205<br>Chatsworth, CA 91313<br>818.826.3777<br>818.993.1288<br>CBN 243509<br>notices@cvlegalsolutions.com<br><br><br>☑ *Attorney for Debtor(s)*<br>☐ *Debtor(s) appearing without an attorney* | |

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF CALIFORNIA – <u>LOS ANGELES</u>        DIVISION

| In re: | CASE NO.: 2:12-bk-13272-WB |
|---|---|
| | CHAPTER: 13 |
| Manuel Gonzalez | **DEBTOR'S NOTICE OF MOTION AND MOTION TO AVOID JUNIOR LIEN ON PRINCIPAL RESIDENCE - AMENDED** [11 U.S.C. § 506(d)] |
| Debtor(s). | DATE: CONTINUED TO MAY 23, 2012<br>TIME: 1:30 pm<br>COURTROOM: 1375<br>FLOOR: 13th Floor |

1. TO: Green Tree Servicing, LLC

2. NOTICE IS HEREBY GIVEN that on the above date and time and in the indicated courtroom, Movant in the above-captioned matter will move this court for an Order granting the relief set forth in the Motion and accompanying supporting documents served and filed herewith.

3. Hearing Location:
   ☑ 255 East Temple Street, Los Angeles
   ☐ 21041 Burbank Boulevard, Woodland Hills
   ☐ 3420 Twelfth Street, Riverside
   ☐ 411 West Fourth Street, Santa Ana
   ☐ 1415 State Street, Santa Barbara

4. **Your rights may be affected.** You should read these papers carefully and discuss them with your attorney, if you have one. (*If you do not have an attorney, you may wish to consult one.*)

5. **Deadline for Opposition Papers:** This Motion is being heard on regular notice pursuant to LBR 9013-1. If you wish to oppose this Motion, you must file a written response with the court and serve a copy of it upon the Movant or Movant's attorney at the address set forth above no less than 14 days prior to the above hearing date. If you fail to file

This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2011*                    Page 1                    **F 4003-2.4.MOTION**

a written response to this Motion within such time period, the court may treat such failure as a waiver of your right to oppose the Motion and may grant the requested relief.

6. **Hearing Date Obtained Pursuant to Judge's Self-Calendaring Procedure:** The undersigned hereby verifies that the above hearing date and time were available for this type of Motion according the judge's self-calendaring procedures.

Date: 4/6/2012

_____
Printed name of law firm *(if applicable)*


Carrissa M Villalobos
_____
Printed Name of Individual Debtor
or Attorney for Debtor

_____
Signature of Individual Debtor
or Attorney for  Debtor

This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2011*                                Page 2                                **F 4003-2.4.MOTION**

**MOTION TO AVOID JUNIOR LIEN ON PRINCIPAL RESIDENCE [11 U.S.C. § 506(d)]**
**(DEBTOR:** Manuel Gonzalez                                              **)**

**NAME OF CREDITOR HOLDING JUNIOR LIEN (Respondent):** Green Tree Servicing, LLC

1. **Property at Issue:** Debtor moves to avoid the junior deed of trust, mortgage or other encumbrance (Lien) encumbering the following real property (Property), which is the principal residence of debtor.

   Street address:          1500 Wimbledon Ct

   Unit number:

   City, state, zip code:    West Covina, CA 91791

   Legal description of Property or document recording number (*including county of recording*):

   Lot 81 of Tract No. 33669, in the City of West Covina, County of Los Angeles, State of California, as shown on

   Map filed in Book 913, Page 26-32 of Maps, Office of the County Recorder of Said County

   ☐ See attached page for legal description of Property or document recording number.

2. **Case History**:

   a.  A voluntary petition under chapter ☐ 7 ☐ 11 ☐ 12 ☑ 13 was filed on (*specify petition date*): 1/30/2012          .

   b.  ☐ An Order of Conversion to chapter 13 was entered on (*specify date*): _____.

3. **Grounds for Avoidance of Junior Lien**:

   a.  As of (*date of title review*) 1/30/2012          , the Property is subject to the following liens in the amounts specified securing the debt against the Property that the debtor seeks to have treated as indicated:

   (1) (*Name of holder of 1st lien*) Bank of America, NA                          in the amount
       of $ 609,359.00              .

   (2) (*Name of holder of 2nd lien*) Green Tree Servicing, LLC                     in the amount
       of $ 126,801.00              ☑ is ☐ is not  to be avoided;

   (3) (*Name of holder of 3rd lien*) _____ in the amount
       of $ _____ ☐ is ☐ is not  to be avoided;

       ☐ See attached page for additional lien(s).

   As of (*date of valuation/appraisal*) 12/20/2011          , Property is worth no more than (*value per valuation/appraisal*) $ 412,000.00              .

   b.  As a result, each Respondent's Lien encumbering the Property is wholly unsecured.

---

This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2011*                                      Page 3                                      **F 4003-2.4.MOTION**

c.  **Evidence in Support of Motion:**

(1) ☑ The amount of the lien identified in paragraph 3(a)(1) is based on (*type of evidence*)
Bank of America NA monthly statement of 9/9/2011 , attached hereto and identified as Exhibit  1  .

(2) ☑ The amount of the lien identified in paragraph 3(a)(2) is based on (*type of evidence*)
Green Tree LLC Notice of 10/04/2010 , attached hereto and identified as Exhibit  2  .

(3) ☐ The amount of the lien identified in paragraph 3(a)(3) is based on (*type of evidence*)
_____, attached hereto and identified as Exhibit ___ .

(4) ☑ The relative priority of the liens encumbering the Property is established by evidence attached as
Exhibit 3&4 .

(5) ☑ The value of the Property from paragraph 3(b) is based on (*type of evidence*)
Appraisal Report completed by Denise Cifu of 12/20/2011 attached as Exhibit  5  .

(6) ☑ Debtor submits the attached Declaration(s).

(7) ☐ Other evidence *(specify/identify supplemental evidence)*: _____
_____, attached as Exhibit ___ .

d.  **WHEREFORE, Debtor prays that this Court issue an Order granting this Motion and establishing**

**that**:

(1) The Property is valued at no more than (*requested value*) $  412,000.00  .

(2) No payments are to be made on the secured claim of the Respondent, and regular mortgage maintenance payments are not to be made, before the Debtor's ☑ completion of the chapter 13 plan, or ☑ receipt of a chapter 13 discharge.

(3) Respondent's(s') claim on the junior position lien(s) shall be allowed as a nonpriority general unsecured claim(s) in the amount per filed Proof of Claim.

(4) The avoidance of the Respondent's(s') junior lien(s) is contingent upon:  Debtor's ☑ completion of the chapter 13 plan, or ☑ receipt of a chapter 13 discharge.

(5) The Respondents shall retain its/their lien(s) in the junior position for the full amount due under the corresponding note and lien in the event of either the dismissal of the Debtor's chapter 13 case, the conversion of the Debtor's chapter 13 case to any other chapter under the United States Bankruptcy Code, or if the Property is sold or refinanced prior to the Debtor's ☑ completion of the chapter 13 plan or ☑ receipt of a chapter 13 discharge.

(6) In the event that the holder of the first position lien or any senior lien on the Property forecloses on its interest and extinguishes the Respondent's(s') lien rights prior to the Debtor's completion of the chapter 13 plan and receipt of a chapter 13 discharge, the Respondent's(s') lien(s) shall attach to the proceeds greater than necessary to pay the senior lien, if any, from the foreclosure sale, subject to the priority of any such junior lien(s).

This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2011*                                        Page 4                                **F 4003-2.4.MOTION**

e.    ☐    See attached continuation page for additional provisions.

Date: ___4/6/2012___

Respectfully submitted,

By: _____
        Signature of Debtor or Attorney for Debtor

Name: __Carrissa M. Villalobos_____
            Printed Name of Debtor or Attorney for Debtor

This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2011                                            Page 5                                            **F 4003-2.4.MOTION**

## DECLARATION OF MANUEL GONZALEZ

I, Manuel Gonzalez, do hereby declare and state as follows:

1.     That I am the Debtor in the herein Chapter 13 bankruptcy;

2.     That I have personal knowledge of the facts wet forth below and if called upon to testify, I could and would competently thereto;

3.     That I caused to be filed the instant Chapter 13 bankruptcy on January 30, 2012. (Case number: 2:12-bk-13272-WB);

4.     That I originally purchased the property located at 1500 Wimbledon Ct, West Covina, CA 91791 ("Property") in 2003 at the price of $160,000.00;

5.     That I valued the Property at $412,000.00 base on my knowledge of comparables in my neighborhood;

6.     That my valuation is also supported by an appraisal report completed on December 20, 2011, by Denise Cifu, a licensed real estate appraiser (See previously referenced Exhibit 5);

7.     That the current balance owed on my first mortgage held by BAC Home Loans Servicing, LP is approximately $609,356.00 (see previously referenced "Exhibit 1"

8.     That the current balance owed on my second mortgage held by Green Tree Servicing, LLC is approximately $126,801.00 (see previously referenced "Exhibit 2");

9.     That BAC Home Loans Servicing, LP represents our First Deed of Trust (previously referenced "Exhibit 3");

10.    That Green Tree Servicing, LLC currently represents our Second Deed of Trust (previously referenced "Exhibit 4");

11.    That the encumbrance by the First Deed of Trust exceeds the fair market value of the Property ($412,000.00);

12.    That I respectfully request that post petition payments to Green Tree Servicing, LLC be stayed;

1    13.     That I respectfully request that upon completion of all plan payments and entry of

2            discharge in this case, the Second Deed of Trust of National City Bank currently

3            serviced by Green Tree Servicing, LLC will be void and will not constitute an

4            encumbrance on the real property described in the motion.

5   I, Manuel Gonzalez, declare under penalty of perjury that the foregoing is true and correct and

6   that this declaration was executed on _2-23-12_ at _Burbank_,

7   California.

8

9   _[signature]_

   Manuel Gonzalez

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

### DECLARATION OF DENISE CIFU

I, Denise Cifu, do hereby declare and state as follows:

1.     I have personal knowledge of the facts set forth below and if called upon to testify, I could and would testify thereto;

2.     I have been a Real Estate Appraiser for the last _10_ years and have been licensed for over _10_ years;

3.     On December 20, 2011, I was retained by Manuel Gonzalez to appraise his residence located at 1500 Wimbledon Ct, West Covina 91791;

4.     I am familiar with the Uniform Standards of Professional Appraisal Practice as promulgated by the Appraisal Standards Board of The Appraisal Foundation and I appraised the Gonzalez residence in conformity with these Standards

5.     I personally inspected the interior and exterior of the subject property and base upon my comparison of the subject property with the properties listed as comparable in my appraisal; I concluded that the subject property was worth approximately $412,000.00 as of December 20, 2011. (see attached Exhibit 5, a true and correct copy of the Residential Appraisal Report dated December 20, 2011).

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on ___7/6/2012___ at ___Ventura___, California.

 

 

                                       _____
                                       Denise Cifu

# EXHIBIT 1


**Bank of America**

**Conv Jumbo ARM - 7042**
1500 WIMBLEDON COURT

**Monthly Statement - September 09, 2011**    Print this page    Return to Account Details

To view any activity since your last statement please select Transaction History

**Next Payment Due**

10/01/2011                                    $2,633.67                    Pay Now

View why your payment is changing by selecting Payment Changes

**Home Loan Summary**

**Home Loan Overview as of 09/09/2011**          **Amount Due on 10/01/2011 as of 09/09/2011**

| | | | |
|---|---|---|---|
| Principal Balance: | $609,356.55 | *Home Loan Payment: | $2,633.67 |
| Escrow Balance: | $866.65 | After 10/17/2011 with Late Payment: | $2,737.01 |
| Interest paid-to-date: | 09/01/2011 | | |
| Late Charge if payment received after 10/17/2011: | $103.34 | | |

*Payments will be applied first to the interest accrued up to the date of payment and then to the principal balance.

**Home Loan Details**

**Monthly Payment Breakdown as of 09/09/2011**          **Loan Type and Term**

| | | | |
|---|---|---|---|
| Principal and Interest Payment: | $2,066.83 | Loan Type : | Conv Jumbo ARM |
| Escrow Payment Amount: | $566.84 | Current Interest Rate : | 2.250% |
| Total Monthly Home Loan Payment: | $2,633.67 | Contractual Remaining Term : | 35 Years, 11 Months |

We may charge you a fee for any payment returned or rejected by your financial institution, subject to applicable law.

**Escrow Account Expenses**

| Principal | Payee | Policy No./Tax ID | Frequency | Next Due Date | Amount Due |
|---|---|---|---|---|---|
| Homeowners Insurance | TRAVELERS INDEMNITY CO | 9885876806331 | Annual | 04/22/2012 | $734.00 |
| County taxes | LOS ANGELES COUNTY TAX COLLECT | 8740022050 | Annual | 11/30/2011 | $2,683.42 |
| County taxes | LOS ANGELES COUNTY TAX COLLECT | 8740022050 | Annual | 03/31/2012 | $2,683.42 |

We are responsible for the payment of the previous escrow items with the exception of the items marked with an asterisk(*). The payment of the items marked with an asterisk (*) are the responsibility of the homeowner.

**Home Loan Activity Since Your Last Statement**

| Date | Description | Principal | Number of Days Interest Paid | Interest | Escrow | Total |
|---|---|---|---|---|---|---|
| 09/09/2011 | Misc posting | $0.00 | 0 | $0.00 | $0.00 | $0.33 |
| 09/09/2011 | September payment | $922.56 | 0 | $1,144.27 | $566.84 | $2,633.67 |
| | Ending Balance | $609,356.55 | | | $866.65 | |

**Credit Reporting Notice:**

We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

**Secure Area**

Accounts    Bill Pay    Transfers    Investments    Customer Service
Privacy & Security    Locations    Alerts    Mail    Help    Site Map    Sign Off

Bank of America, N.A. Member FDIC. Equal Housing Lender
© 2011 Bank of America Corporation. All rights reserved.

Ex 1 pg 1 of 1

https://www8.bankofamerica.com/myloans/accounts/account-details/mortgageCurrentStat...    10/10/2011

# EXHIBIT 2

# green tree

PO Box 6172
Rapid City, SD 57709-6172

Tel 1-800-643-0202
GTServicing.com

October 4, 2010

+ 0303539 000000039 096TRS 0055397 0
MANUEL GONZALEZ
1500 WIMBLEDON CT
WEST COVINA CA 91791-4047

**Re: Green Tree Servicing LLC\* ("Green Tree") Account No.: 897856936
Creditor: U.S. Bank National Association, not in its individual capacity, but solely as trustee under the
Grand New Start Pass-Through Trust Agreement**

Dear Valued Customer:

The servicing of your loan was transferred from PNC Mortgage, a Division of PNC Banks, NA to Green Tree on
September 1, 2010.  We are pleased to welcome you to Green Tree.

As your new servicer for the referenced account, Green Tree is required to inform you of the following important
notice regarding your rights under federal law:

**AS OF AUGUST 31, 2010, YOU OWE $126,801.30. BECAUSE OF INTEREST, LATE CHARGES,
AND OTHER CHARGES THAT MAY VARY FROM DAY TO DAY, THE AMOUNT DUE ON THE
DAY YOU PAY MAY BE GREATER. HENCE, IF YOU PAY THE AMOUNT SHOWN ABOVE, AN
ADJUSTMENT MAY BE NECESSARY AFTER WE RECEIVE YOUR CHECK, IN WHICH EVENT
WE WILL INFORM YOU BEFORE DEPOSITING THE CHECK FOR COLLECTION. FOR
FURTHER INFORMATION, CONTACT CUSTOMER SERVICE AT THE ADDRESS OR TOLL-
FREE NUMBER LISTED ABOVE.**

**UNLESS YOU NOTIFY US WITHIN THIRTY (30) DAYS AFTER RECEIVING THIS NOTICE THAT
YOU DISPUTE THE VALIDITY OF THIS DEBT, OR ANY PORTION OF THE DEBT, WE WILL
ASSUME THAT THE DEBT IS VALID. IF YOU NOTIFY US IN WRITING WITHIN THIRTY (30)
DAYS OF RECEIVING THIS NOTICE, WE WILL OBTAIN VERIFICATION OF THE DEBT (OR
OBTAIN A COPY OF A JUDGMENT, IF THE DEBT HAS BEEN REDUCED TO JUDGMENT) AND
MAIL THE VERIFICATION TO YOU. IN ADDITION, UPON YOUR WRITTEN REQUEST WITHIN
THIRTY (30) DAYS AFTER RECEIVING THIS NOTICE, WE WILL ALSO PROVIDE YOU WITH
THE NAME AND ADDRESS OF THE ORIGINAL CREDITOR, IF DIFFERENT FROM THE
CURRENT CREDITOR.**

To ensure timely posting of your payments, please send all payments to your new servicer at the address indicated
below:

**Green Tree
PO Box 94710
Palatine, IL 60094-4710**

We at Green Tree are honored to serve you.  If you need to contact us or have any questions, please call Green
Tree at 1-866-270-3285, from 6:00 a.m. to 7:00 p.m. MST, Monday through Thursday, or 6:00 a.m. to 12:00 p.m.
MST, Friday and Saturday, or write to us in regard to this debt at Customer Service, PO Box 6172, Rapid City,
South Dakota  57709-6172.

Respectfully,

Green Tree

\*Green Tree Servicing LLC and related entities, including, for certain loans, in Alabama, Green Tree-AL LLC; in Minnesota,
Green Tree Loan Company; and in Pennsylvania, Green Tree Consumer Discount Company.

Fair and Accurate Credit Transactions Act Notice: We may report information about your account to credit bureaus. Late
payments, missed payments, or other defaults on your account may be reflected in your credit report.

**This letter is from a debt collector. It is an attempt to collect a debt, and any information obtained will be used for
that purpose.**

12

**Ex 2 pg 1 of 1**

# EXHIBIT 3



**This page is part of your document - DO NOT DISCARD**

**06 1535641**

**RECORDED/FILED IN OFFICIAL RECORDS
RECORDER'S OFFICE
LOS ANGELES COUNTY
CALIFORNIA
07/12/06 AT 08:00am**

## TITLE(S) :



L E A D    S H E E T

FEE

| FEE $6 |  | RR |
|---|---|---|
| DAF $ |  |  |
| C-20 |  | 19 |

**CODE
20**

**CODE
19**

**CODE
9____**

D.T.T.

NOTIFICATION SENT $4 ◎

Assessor's Identification Number (AIN)
To be completed by Examiner OR Title Company in black ink.      **Number of AIN's Shown**

i 4

**Ex 3 pg 1 of 20**

**THIS FORM IS NOT TO BE DUPLICATED**

Recording Requested By:
CALIFORNIA EMPIRE FINANCIAL
GROUP, INC.

**06  1535641**

And After Recording Return To:
CALIFORNIA EMPIRE FINANCIAL GROUP, INC.
10681 FOOTHILL BLVD. #200
RANCHO CUCAMONGA, CALIFORNIA 92270
Loan Number: 030606058

———————— [Space Above This Line For Recording Data] ————————

# DEED OF TRUST

**MIN:**  100306000000096775

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** "Security Instrument" means this document, which is dated    JULY 5, 2006              , together with all Riders to this document.
**(B)** "Borrower" is   MANUEL GONZALEZ, AN UNMARRIED MAN


Borrower is the trustor under this Security Instrument.
**(C)** "Lender" is   CALIFORNIA EMPIRE FINANCIAL GROUP, INC.

Lender is a   CALIFORNIA CORPORATION                           organized
and existing under the laws of   CALIFORNIA
Lender's address is   69-730 HWY 111 SUITE 100, RANCHO MIRAGE, CALIFORNIA
92270

**(D)** "Trustee" is   STEWART TITLE OF CALIFORNIA, INC.
525 NORTH BRAND BOULEVARD, GLENDALE, CALIFORNIA 91203

**(E)** "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(F)** "Note" means the promissory note signed by Borrower and dated    JULY 5, 2006            .
The Note states that Borrower owes Lender   FIVE HUNDRED TWENTY-NINE THOUSAND
SEVEN HUNDRED FIFTY AND 00/100    Dollars (U.S. $  529,750.00      ) plus interest.

Borrower Initials:

\15

**Ex 3 pg 2 of 20**

3

Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than AUGUST 1, 2046 .

(G)  "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H)  "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I)  "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

[X] Adjustable Rate Rider    [ ] Planned Unit Development Rider
[ ] Balloon Rider    [ ] Biweekly Payment Rider
[ ] 1-4 Family Rider    [ ] Second Home Rider
[ ] Condominium Rider    [ ] Other(s) [specify]

(J)  "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K)  "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L)  "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M)  "Escrow Items" means those items that are described in Section 3.

(N)  "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O)  "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P)  "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q)  "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R)  "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's

Borrower Initials:

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01    Page 2 of 14    DocMagic eForms 800-649-1362 www.docmagic.com

Ex 3 pg 3 of 20

16

covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
COUNTY                    of                    LOS ANGELES                    :
[Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]
LOT 81 OF TRACT NO. 33669, IN THE CITY OF WEST COVINA, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS SHOWN ON MAP FILED IN BOOK 913, PAGE 26-32 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY
A.P.N.: 8740-022-050

which currently has the address of    1500 WIMBLEDON COURT
                                           [Street]

          WEST COVINA                    , California    91791    ("Property Address"):
             [City]                                      [Zip Code]

          TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.
          BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.
          THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

          UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
          1.    Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender:  (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.
          Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not

Borrower Initials: _____    _____    _____    _____    _____

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01                    Page 3 of 14

DocMagic EFForms 800-649-1362
www.docmagic.com

Ex 3 pg 4 of 20
17
ec 1535641

obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.   **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.   **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender

Borrower Initials: _____  _____  _____  _____  _____  _____

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01
Page 4 of 14
DocMagic ⓔFⓡⓐⓝⓢ 800-649-1362
www.docmagic.com

**Ex 3 pg 5 of 20**

06 1535641

18

shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

Borrower Initials: _____  _____  _____  _____  _____  _____

Ex 3 pg 6 of 20

nn 1535641

19

1

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

Borrower Initials: _____

20

Ex 3 pg 7 of 20
06 1535641

8.  **Borrower's Loan Application.**  Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan.  Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.  **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**  If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.  Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding.  Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off.  Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so.  It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease.  If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10.  **Mortgage Insurance.**  If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect.  If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender.  If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect.  Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance.  Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve.  Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance.  If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law.  Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed.  Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses.  These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements.  These

Borrower Initials: _____    _____    _____    _____

Ex 3 pg. 8 of 20

06 1535641

21

  
*q*

agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower Initials:

aa

**Ex 3 pg 9 of 20**
06 1535641

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender

Borrower Initials: _____  _____  _____  _____  _____

E 3 pg 10 of 20

23

0c 1535641

specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note

Borrower Initials: _____ _____ _____ _____ _____ _____

Ex 3 pg 11 of 20

06 1535641

and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The

Borrower Initials: _____    _____    _____    _____    _____

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01                                    Page 11 of 14

DocMagic *eForms* 800-649-1362
www.docmagic.com

25

1a

**Ex 3 pg 12 of 20**
06 1535641

notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. **Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. **Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

Borrower Initials: _____ _____ _____ _____ _____ _____

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01                                          Page 12 of 14

DocMagic ℰℛᴏᴏᴍᴍ  800-649-1362
www.docmagic.com

Ex 3 pg 13 of 20

26

06 1535641

14

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)          _____ (Seal)
MANUEL GONZALEZ               -Borrower                                   -Borrower


_____ (Seal)          _____ (Seal)
                              -Borrower                                   -Borrower


_____ (Seal)          _____ (Seal)
                              -Borrower                                   -Borrower


Witness:                                  Witness:


_____                  _____

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01                              Page 13 of 14

DocMagic *EForms* 800-649-1362
www.docmagic.com

zEx 3 pg 14 of 20
27

06 1535641

State of California                              )
                                                 ) ss.
County of  LOS ANGELES                           )

On  JULY 6, 2006   before me, MARILYN EURIN, NOTARY PUBLIC

personally appeared   MANUEL GONZALEZ

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.



MARILYN EURIN
Commission # 1548436
Notary Public - California
Los Angeles County
My Comm. Expires Jan 29, 2009

_____
NOTARY SIGNATURE

MARILYN EURIN, NOTARY PUBLIC
(Typed Name of Notary)

NOTARY SEAL

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3005 01/01                          Page 14 of 14

DocMagic eForms  800-649-1362
www.docmagic.com

Ex 3 pg 15 of 20
28
06 1535641

16

MIN: 100306000000096775                          Loan Number: 030606058
Doc ID#:

## ADJUSTABLE RATE RIDER
### (MTA-Twelve Month Average Index - Payment Caps)

THIS ADJUSTABLE RATE RIDER is made this      5th         day of JULY
2006            , and is incorporated into and shall be deemed to amend and supplement the
Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by
the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
CALIFORNIA EMPIRE FINANCIAL GROUP, INC., A CALIFORNIA CORPORATION
("Lender") of the same date and covering the property described in the Security Instrument and
located at:
      1500 WIMBLEDON COURT, WEST COVINA, CALIFORNIA 91791
                          [Property Address]

**THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE
AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT
THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL
AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY
BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THE NOTE.**

**ADDITIONAL COVENANTS:** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agrees as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for changes in the interest rate and the monthly payments, as follows:

**2.   INTEREST**
**(A)  Interest Rate**
Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I
will pay interest at a yearly rate of     1.250 %.  The interest rate I will pay may change.
    The interest rate required by this Section 2 is the rate I will pay both before and after any
default described in Section 7(B) of the Note.

**(B)  Interest Rate Change Dates**
The interest rate I will pay may change on the      1st        day of SEPTEMBER
2006            , and on that day every month thereafter. Each date on which my interest
rate could change is called an "Interest Rate Change Date." The new rate of interest will become
effective on each Interest Rate Change Date. The interest rate may change monthly, but the
monthly payment is recalculated in accordance with Section 3.

Borrower Initials:
**PayOption MTA ARM Rider**
FE-5315 (0511)                          Page 1 of 5

**Ex 3 pg 16 of 20**

27                          06 1535641

**(C) Index**

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(D) Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE AND 325/1000      percentage point(s)    3.325 % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than   9.950 %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

**3.  PAYMENTS**

**(A)  Time and Place of Payments**

I will make a payment every month.

I will make my monthly payments on the      1st         day of each month beginning on SEPTEMBER 1, 2006     .  I will make these payments every month until I have paid all the Principal and Interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on AUGUST 1, 2046      , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 10681 FOOTHILL BLVD. #200, RANCHO CUCAMONGA, CALIFORNIA 91730
or at a different place if required by the Note Holder.

**(B)  Amount of My Initial Monthly Payments**

Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $1,403.02        unless adjusted under Section 3 (F).

**(C)  Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the   1st
day of SEPTEMBER, 2007  , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below.  If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

Borrower Initials: _____ _____ _____ _____ _____

PayOption MTA ARM Rider

FE-5315 (0511)                         Page 2 of 5

**Ex 3 pg 17 of 20**

06 1535641

18

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D)  Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

**(E)  Additions to My Unpaid Principal**

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3 (D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3 (A).

**(F)  Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed the Maximum Limit equal to ONE HUNDRED FIFTEEN AND 000/1000 percent ( 115.000 %)of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

**(G)  Required Full Payment**

On the    5th    Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

PayOption MTA ARM Rider
FE-5315 (0511)                    Page 3 of 5          **Ex 3 pg 18 of 20**

Borrower Initials: _____  _____  _____  _____  _____

07/12/06

06 1535641

**(H) Payment Options**

After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

(i) **Interest Only Payment:** the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii) **Fully Amortized Payment:** the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.

(iii) **15 Year Amortized Payment:** the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

**B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument entitled "Transfer of the Property or a Beneficial Interest in Borrower" is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument.  Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

Borrower Initials: _____  _____  _____  _____  _____  _____
PayOption MTA ARM Rider
FE-5315 (0511)                              Page 4 of 5

**Ex 3 pg 19 of 20**

3a

**06  1535641**

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____
MANUEL GONZALEZ                                              -Borrower

_____
                                                             -Borrower

_____
                                                             -Borrower

_____
                                                             -Borrower

PayOption MTA ARM Rider
FE-5315 (0511)                        Page 5 of 5

**Ex 3 pg 20 of 20**

06 1535641

# EXHIBIT 4



05/30/07

**20071301005**

This document was prepared by KATHLEEN AVONDET National City Bank
6750 Miller Road Brecksville, OH 44141
Please return this document after recording to:

NCB, CLS BRECKSVILLE
DOCUMENTATION, LOCATOR 7120
6750 MILLER ROAD
BRECKSVILLE, OH 44141

8740 - 022 - 012

———— State of California ————————————— Space Above This Line For Recording Data ————

## DEED OF TRUST

**Ex 4 pg 1 of 9**

This document was prepared by KATHLEEN AVONDET National City Bank

6750 Miller Road Brecksville, OH 44141
Please return this document after recording to:

NCB, CLS BRECKSVILLE
DOCUMENTATION, LOCATOR 7120
6750 MILLER ROAD
BRECKSVILLE, OH 44141

8740 - 022 - 012

———————— State of California ————————————————— Space Above This Line For Recording Data ————————

# DEED OF TRUST
(With Future Advance Clause)

1. **DATE AND PARTIES.** The date of this Deed of Trust (Security Instrument) is May 21, 2007 ..............................
   The parties and their addresses are:
   TRUSTOR:    MANUEL GONZALEZ An Unmarried Man


   1500 WIMBLEDON CT WEST COVINA, California 91791

   ☐ If checked, refer to the attached Addendum incorporated herein, for additional Trustors, their signatures and
   acknowledgments.
   TRUSTEE:    National City Bank



   LENDER:    NATIONAL CITY BANK



2. **CONVEYANCE.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure
   the Secured Debt (defined below) and Trustor's performance under this Security Instrument, Trustor irrevocably grants,
   conveys and sells to Trustee, in trust for the benefit of Lender, with power of sale, the following described property:
   SEE ATTACHED EXHIBIT "A"    Signature Addendum


   The property is located in Los Angeles ........................................ at ..................................................
                                                (County)
   1500 WIMBLEDON CT ................ , ........ WEST COVINA .......................... , California 91791 ........
   (Address)                                  (City)                                         (ZIP Code)
   Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, all water and riparian rights,
   ditches, and water stock and all existing and future improvements, structures, fixtures, and replacements that may now, or at
   any time in the future, be part of the real estate described above (all referred to as "Property").

3. **MAXIMUM OBLIGATION LIMIT.** The total principal amount secured by this Security Instrument at any one time shall
   not exceed $ ......... 120,000.00 .... . This limitation of amount does not include interest and other fees and charges validly
   made pursuant to this Security Instrument. Also, this limitation does not apply to advances made under the terms of this
   Security Instrument to protect Lender's security and to perform any of the covenants contained in this Security Instrument.

4. **SECURED DEBT AND FUTURE ADVANCES.** The term "Secured Debt" is defined as follows:
   A. Debt incurred under the terms of all promissory note(s), contract(s), guaranty(ies) or other evidence of debt described
   below and all their extensions, renewals, modifications or substitutions. *(Include items such as borrowers' names, note
   or contract amounts, interest rates (whether variable), maturity dates, etc.)*

Maturity Date: 5/21/2022

CALIFORNIA - DEED OF TRUST (NOT FOR FNMA, FHLMC, FHA OR VA USE)
© 1994 Wolters Kluwer Financial Services - Bankers Systems, Inc., Form RE-DT-CA 2/9/2006
VMP®-C165(CA) (0805)

(page 1 of 6)

**Ex 4 pg 2 of 9**

B. All future advances from Lender to Trustor or other future obligations of Trustor to Lender under any promissory note, contract or guaranty, or other evidence of debt executed by Trustor in favor of Lender after this Security Instrument if this Security Instrument is specifically referenced on the evidence of other debt. If more than one person signs this Security Instrument, each Trustor agrees that this Security Instrument will secure all future advances and future obligations that are given to or incurred by any one or more Trustor, or any one or more Trustor and others. All future advances and other future obligations are secured by this Security Instrument even though all or part may not yet be advanced. All future advances and other future obligations are secured as if made on the date of this Security Instrument. Nothing in this Security Instrument shall constitute a commitment to make additional or future loans or advances in any amount. Any such commitment must be agreed to in a separate writing.

C. All additional sums advanced and expenses incurred by Lender for insuring, preserving or otherwise protecting the Property and its value and any other sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

D. Performance of every obligation in this Security Instrument (including any subsequent instrument amending this Security Instrument) and any instrument now or later evidencing or securing any indebtedness secured by this Security Instrument.

This Security Instrument will not secure any other debt if Lender fails to give any required notice of the right of rescission.

5. **PAYMENTS.** Trustor agrees that all payments under the Secured Debt will be paid when due and in accordance with the terms of the Secured Debt and this Security Instrument.

6. **WARRANTY OF TITLE.** Trustor warrants that Trustor is or will be lawfully seized of the estate conveyed by this Security Instrument and has the right to irrevocably grant, convey and sell the Property to Trustee, in trust, with power of sale. Trustor also warrants that the Property is unencumbered, except for encumbrances of record.

7. **PRIOR SECURITY INTERESTS.** With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property, Trustor agrees:
   A. To make all payments when due and to perform or comply with all covenants.

   B. To promptly deliver to Lender any notices that Trustor receives from the holder.

   C. Not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by the lien document without Lender's prior written consent.

8. **CLAIMS AGAINST TITLE.** Trustor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due. Lender may require Trustor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Trustor's payment. Trustor will defend title to the Property against any claims that would impair the lien of this Security Instrument. Trustor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses Trustor may have against parties who supply labor or materials to maintain or improve the Property.

9. **DUE ON SALE OR ENCUMBRANCE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, any lien, encumbrance, transfer or sale of all or any part of the Property. This right is subject to the restrictions imposed by federal law (12 C.F.R. 591), as applicable. This covenant shall run with the Property and shall remain in effect until the Secured Debt is paid in full and this Security Instrument is released.

10. **PROPERTY CONDITION, ALTERATIONS AND INSPECTION.** Trustor will keep the Property in good condition and make all repairs that are reasonably necessary. Trustor shall not commit or allow any waste, impairment, or deterioration of the Property. Trustor will keep the Property free of noxious weeds and grasses. Trustor agrees that the nature of the occupancy and use will not substantially change without Lender's prior written consent. Trustor will not permit any change in any license, restrictive covenant or easement without Lender's prior written consent. Trustor will notify Lender of all demands, proceedings, claims, and actions against Trustor, and of any loss or damage to the Property.

Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time for the purpose of inspecting the Property. Lender shall give Trustor notice at the time of or before an inspection specifying a reasonable purpose for the inspection. Any inspection of the Property shall be entirely for Lender's benefit and Trustor will in no way rely on Lender's inspection.

11. **AUTHORITY TO PERFORM.** If Trustor fails to perform any duty or any of the covenants contained in this Security Instrument, Lender may, without notice, perform or cause them to be performed. Trustor appoints Lender as attorney in fact to sign Trustor's name or pay any amount necessary for performance. Lender's right to perform for Trustor shall not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's

© 1994 Wolters Kluwer Financial Services - Bankers Systems, Inc., Form RE-DT-CA 2/9/2006
VMP®-C165(CA) (0605)

*(page 2 of 6)*

**Ex 4 pg 3 of 9**

other rights under the law or this Security Instrument. If any construction on the Property is discontinued or not carried on in a reasonable manner, Lender may take all steps necessary to protect Lender's security interest in the Property, including completion of the construction.

12. **ASSIGNMENT OF LEASES AND RENTS.** Trustor irrevocably assigns, grants, and conveys, to Trustee, in trust for the benefit of Lender as additional security all the right, title and interest in the following (all referred to as Property): existing or future leases, subleases, licenses, guaranties and any other written or verbal agreements for the use and occupancy of the Property, including any extensions, renewals, modifications or replacements (all referred to as Leases); and rents, issues and profits (all referred to as Rents). In the event any item listed as Leases or Rents is determined to be personal property, this Assignment will also be regarded as a security agreement. Trustor will promptly provide Lender with copies of the Leases and will certify these Leases are true and correct copies. The existing Leases will be provided on execution of the Assignment, and all future Leases and any other information with respect to these Leases will be provided immediately after they are executed. Trustor may collect, receive, enjoy and use the Rents so long as Trustor is not in default.

Upon default, Trustor will receive any Rents in trust for Lender and will not commingle the Rents with any other funds. Trustor agrees that this Security Instrument is immediately effective between Trustor and Lender and effective as to third parties on the recording of this Assignment. This Security Instrument will remain effective during any statutory redemption period until the Secured Debts are satisfied. As long as this Assignment is in effect, Trustor warrants and represents that no default exists under the Leases, and the parties subject to the Leases have not violated any applicable law on leases, licenses and landlords and tenants.

13. **LEASEHOLDS; CONDOMINIUMS; PLANNED UNIT DEVELOPMENTS.** Trustor agrees to comply with the provisions of any lease if this Security Instrument is on a leasehold. If the Property includes a unit in a condominium or a planned unit development, Trustor will perform all of Trustor's duties under the covenants, by-laws, or regulations of the condominium or planned unit development.

14. **DEFAULT.** Trustor will be in default if any party obligated on the Secured Debt fails to make payment when due. Trustor will be in default if a breach occurs under the terms of this Security Instrument or any other document executed for the purpose of creating, securing or guarantying the Secured Debt. A good faith belief by Lender that Lender at any time is insecure with respect to any person or entity obligated on the Secured Debt or that the prospect of any payment or the value of the Property is impaired shall also constitute an event of default.

15. **REMEDIES ON DEFAULT.** In some instances, federal and state law will require Lender to provide Trustor with notice of the right to cure, or other notices and may establish time schedules for foreclosure actions. Subject to these limitations, if any, Lender may accelerate the Secured Debt and foreclose this Security Instrument in a manner provided by law if Trustor is in default.

At the option of Lender, all or any part of the agreed fees and charges, accrued interest and principal shall become immediately due and payable, after giving notice if required by law, upon the occurrence of a default or anytime thereafter. In addition, Lender shall be entitled to all the remedies provided by law, the terms of the Secured Debt, this Security Instrument and any related documents, including without limitation, the power to sell the Property.

If Lender elects to foreclose by exercise of the power of sale, Lender will declare the entire Secured Debts due and payable by delivering to Trustee in this Security Instrument and any evidence of the Secured Debts, receipts and evidence of expenditures made and secured, as Trustee requires. When the legally prescribed time passes after Trustee or Lender duly records a notice of default, the Trustee, Lender or other person authorized to take the sale will give a notice of sale as required by law and will cause the Property to be sold at the time and place fixed in the notice of sale. Lender may rescind any notice of default at any time before the Property's sale. Rescission will occur when Lender executes and records a notice of rescission that cancels any prior notice of default and any related acceleration of the Secured Debts. Lender's rescission will not waive any default then existing or subsequently occurring or preclude Lender exercising its remedies, including the power of sale, at another time.

The Property can be sold as a whole or in separate parcels and in any order that Trustee decides. The Property will be sold to the highest bidder for cash in lawful money of the United States, payable at sale time. The Property can be sold to anyone, including Trustor, Trustee or Lender. Trustee may postpone the sale of any part of the Property by public announcement at the time and place of this sale and afterwards at the time fixed by the preceding postponement. Upon any sale of the Property, Trustee will make and deliver a special or limited warranty deed that conveys the property sold to the purchaser or purchasers. Under this special or limited warranty deed, Trustee will covenant that Trustee has not caused or allowed a lien or an encumbrance to burden the Property and that Trustee will specially warrant and defend the Property's title to the purchaser or purchasers at the sale against all lawful claims and demand of all persons claiming by, through or under Trustee. The deed's recital of facts will be conclusive proof of the truthfulness of these facts.

*(page 3 of 6)*

© 1994 Wolters Kluwer Financial Services - Bankers Systems, Inc., Form RE-DT-CA 2/9/2006
VMP®-C165(CA) (0605)

**Ex 4 pg 4 of 9**

The proceeds from the Property's sale will be applied to the sale expenses, Trustee's expenses, Lender's attorneys' fees due on Trustor's default, sums that Trustee or Lender paid for procuring a title search of the Property's title subsequent to the execution of this Security Instrument, all outstanding amounts due under this Security Instrument and the remainder to anyone legally entitled to the remaining amounts due.

All remedies are distinct, cumulative and not exclusive, and the Lender is entitled to all remedies provided at law or equity, whether or not expressly set forth. The acceptance by Lender of any sum in payment or partial payment on the Secured Debt after the balance is due or is accelerated or after foreclosure proceedings are filed shall not constitute a waiver of Lender's right to require complete cure of any existing default. By not exercising any remedy on Trustor's default, Lender does not waive Lender's right to later consider the event a default if it continues or happens again.

16. **EXPENSES; ADVANCES ON COVENANTS; ATTORNEYS' FEES; COLLECTION COSTS.** Except when prohibited by law, Trustor agrees to pay all of Lender's expenses if Trustor breaches any covenant (including, but not limited to, advances and expenses as described in the AUTHORITY TO PERFORM and INSURANCE sections) in this Security Instrument. Trustor will also pay on demand any amount incurred by Lender for insuring, inspecting, preserving or otherwise protecting the Property and Lender's security interest. These expenses will bear interest from the date of the payment until paid in full at the highest interest rate in effect as provided in the terms of the Secured Debt. Trustor agrees to pay all costs and expenses incurred by Lender in collecting, enforcing or protecting Lender's rights and remedies under this Security Instrument. This amount may include, but is not limited to, attorneys' fees, court costs, and other legal expenses. This Security Instrument shall remain in effect until released. Trustor agrees to pay for any recordation costs of such release.

17. **ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) Environmental Law means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.), and all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) Hazardous Substance means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substances," "hazardous waste" or "hazardous substance" under any Environmental Law.

Trustor represents, warrants and agrees that:

A. Except as previously disclosed and acknowledged in writing to Lender, no Hazardous Substance is or will be located, stored or released on or in the Property. This restriction does not apply to small quantities of Hazardous Substances that are generally recognized to be appropriate for the normal use and maintenance of the Property.

B. Except as previously disclosed and acknowledged in writing to Lender, Trustor and every tenant have been, are, and shall remain in full compliance with any applicable Environmental Law.

C. Trustor shall immediately notify Lender if a release or threatened release of a Hazardous Substance occurs on, under or about the Property or there is a violation of any Environmental Law concerning the Property. In such an event, Trustor shall take all necessary remedial action in accordance with any Environmental Law.

D. Trustor shall immediately notify Lender in writing as soon as Trustor has reason to believe there is any pending or threatened investigation, claim, or proceeding relating to the release or threatened release of any Hazardous Substance or the violation of any Environmental Law.

18. **CONDEMNATION.** Trustor will give Lender prompt notice of any pending or threatened action, by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Trustor authorizes Lender to intervene in Trustor's name in any of the above described actions or claims. Trustor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds shall be considered payments and will be applied as provided in this Security Instrument. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

19. **INSURANCE.** Trustor shall keep Property insured against loss by fire, flood, theft and other hazards and risks reasonably associated with the Property due to its type and location. This insurance shall be maintained in the amounts and for the periods that Lender requires. What Lender requires pursuant to the preceding two sentences can change during the term of the Secured Debt. The insurance carrier providing the insurance shall be chosen by Trustor subject to Lender's approval, which shall not be unreasonably withheld. If Trustor fails to maintain the coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property according to the terms of this Security Instrument.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard "mortgage clause" and, where applicable, "loss payee clause." Trustor shall immediately notify Lender of cancellation or termination of the insurance. Lender shall have the right to hold the policies and renewals. If Lender requires, Trustor shall immediately give to Lender all receipts of paid premiums and renewal notices. Upon loss, Trustor shall give immediate notice to the insurance carrier and Lender. Lender may make proof of loss if not made immediately by Trustor.

© 1994 Wolters Kluwer Financial Services - Bankers Systems, Inc., Form RE-DT-CA 2/9/2006
VMP®-C165(CA) (0605)

(page 4 of 6)

**Ex 4 pg 5 of 9**

Unless otherwise agreed in writing, all insurance proceeds shall be applied to the restoration or repair of the Property or to the Secured Debt, whether or not then due, at Lender's option. Any application of proceeds to principal shall not extend or postpone the due date of the scheduled payment nor change the amount of any payment. Any excess will be paid to the Trustor. If the Property is acquired by Lender, Trustor's right to any insurance policies and proceeds resulting from damage to the Property before the acquisition shall pass to Lender to the extent of the Secured Debt immediately before the acquisition.

20. **ESCROW FOR TAXES AND INSURANCE.** Unless otherwise provided in a separate agreement, Trustor will not be required to pay to Lender funds for taxes and insurance in escrow.

21. **FINANCIAL REPORTS AND ADDITIONAL DOCUMENTS.** Trustor will provide to Lender upon request, any financial statement or information Lender may deem reasonably necessary. Trustor agrees to sign, deliver, and file any additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Trustor's obligations under this Security Instrument and Lender's lien status on the Property.

22. **JOINT AND INDIVIDUAL LIABILITY; CO-SIGNERS; SUCCESSORS AND ASSIGNS BOUND.** All duties under this Security Instrument are joint and individual. If Trustor signs this Security Instrument but does not sign an evidence of debt, Trustor does so only to mortgage Trustor's interest in the Property to secure payment of the Secured Debt and Trustor does not agree to be personally liable on the Secured Debt. Trustor agrees that Lender and any party to this Security Instrument may extend, modify or make any change in the terms of this Security Instrument or any evidence of debt without Trustor's consent. Such a change will not release Trustor from the terms of this Security Instrument. The duties and benefits of this Security Instrument shall bind and benefit the successors and assigns of Trustor and Lender.

23. **APPLICABLE LAW; SEVERABILITY; INTERPRETATION.** This Security Instrument is governed by the laws of the jurisdiction in which Lender is located, except to the extent otherwise required by the laws of the jurisdiction where the Property is located. This Security Instrument is complete and fully integrated. This Security Instrument may not be amended or modified by oral agreement. Any section in this Security Instrument, attachments, or any agreement related to the Secured Debt that conflicts with applicable law will not be effective, unless that law expressly or impliedly permits the variations by written agreement. If any section of this Security Instrument cannot be enforced according to its terms, that section will be severed and will not affect the enforceability of the remainder of this Security Instrument. Whenever used, the singular shall include the plural and the plural the singular. The captions and headings of the sections of this Security Instrument are for convenience only and are not to be used to interpret or define the terms of this Security Instrument. Time is of the essence in this Security Instrument.

24. **SUCCESSOR TRUSTEE.** Lender, at Lender's option, may from time to time remove Trustee and appoint a successor trustee without any other formality than the designation in writing. The successor trustee, without conveyance of the Property, shall succeed to all the title, power and duties conferred upon Trustee by this Security Instrument and applicable law.

25. **NOTICE.** Unless otherwise required by law, any notice shall be given by delivering it or by mailing it by first class mail to the appropriate party's address on page 1 of this Security Instrument, or to any other address designated in writing. Notice to one trustor will be deemed to be notice to all trustors. Lender and Trustor request that copies of any notice of default or notice of sale under a superior instrument be sent to Lender and Trustor at the addresses listed in the DATE AND PARTIES section.

26. **WAIVERS.** Except to the extent prohibited by law, Trustor waives all appraisement or marshalling of assets relating to the Property.

27. **STATEMENT OF OBLIGATION.** Lender may collect a fee not to exceed the maximum allowed by applicable law for furnishing the statement of obligation as provided in Section 2943 of the Civil Code of California.

28. **SPOUSE'S SEPARATE PROPERTY.** Any Trustor who is a married person or registered domestic partner expressly agrees that recourse may be had against his or her separate property.

© 1994 Wolters Kluwer Financial Services - Bankers Systems, Inc., Form RE-DT-CA 2/9/2006
VMP®-C165(CA) (0605)

40

**Ex 4 pg 6 of 9**

**29. OTHER TERMS.** If checked, the following are applicable to this Security Instrument:

☐ **Line of Credit.** The Secured Debt includes a revolving line of credit provision. Although the Secured Debt may be reduced to a zero balance, this Security Instrument will remain in effect until released.

☐ **Construction Loan.** This Security Instrument secures an obligation incurred for the construction of an improvement on the Property.

☐ **Fixture Filing.** Trustor grants to Lender a security interest in all goods that Trustor owns now or in the future and that are or will become fixtures related to the Property. This Security Instrument suffices as a financing statement and any carbon, photographic or other reproduction may be filed of record for purposes of Article 9 of the Uniform Commercial Code.

☐ **Riders.** The covenants and agreements of each of the riders checked below are incorporated into and supplement and amend the terms of this Security Instrument. [Check all applicable boxes]
☐ Condominium Rider  ☐ Planned Unit Development Rider  ☐ Other ...........................................

☐ **Additional Terms.**

**SIGNATURES:** By signing below, Trustor agrees to the terms and covenants contained in this Security Instrument and in any attachments. Trustor also acknowledges receipt of a copy of this Security Instrument on the date stated on page 1.

..................................    5/1/12    .......................................................
(Signature)                                (Date)    (Signature)                                      (Date)
MANUEL GONZALEZ

**ACKNOWLEDGMENT:**

(Individual) STATE OF ........................................ , COUNTY OF ........................................ } ss.

On this ........................ day of ........................................ before me ........................
a notary public, personally appeared ........................................
........................................................................................
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
WITNESS my hand and official seal.

Signature ........................................................................................
Name (typed or printed)

(Seal)

My commission expires: ........................................................................

---

**REQUEST FOR FULL RECONVEYANCE**

To Trustee:

The undersigned is the holder of the note or notes secured by this Deed of Trust, which was recorded in the office of the Recorder of ........................................ County, State of California, in book ........................ , page ........................ of official records. Said note or notes, together with all other indebtedness secured by this Deed of Trust, have been paid in full. You are hereby directed to cancel said note or notes and this Deed of Trust, which are delivered hereby, and to reconvey, without warranty, all the estate now held by you under this Deed of Trust to the person or persons legally entitled thereto.

Dated: ........................................................................................

Assessor's Identification Number ................ - ................ - ................

07 1301005

© 1994 Wolters Kluwer Financial Services - Bankers Systems, Inc., Form RE-DT-CA 2/9/2006    (page 6 of 6)
VMP®-C165(CA) (0605)

**Ex 4 pg 7 of 9**

# SIGNATURE ADDENDUM TO SECURITY INSTRUMENT

Definition: "Security Instrument." The Deed of Trust, Mortgage, Trust Deed, Deed to Secure Debt or Security Deed given to secure the debt to the Lender of the same date.

Mortgagor(s)/Borrower(s) on Security Instrument:

MANUEL GONZALEZ

Property Address:

1500 WIMBLEDON CT
WEST COVINA California 91791

Lender:          National City Bank

Lender Reference Number:  0005575984

**ADDITIONAL SIGNATURES:** By signing below, Grantor(s) / Mortgagor(s) / Trustor(s) / Settlor(s) agrees to the terms and covenants contained in the Security Instrument and in any attachments. Grantors(s) / Mortgagor(s) / Trustor(s) / Settlor(s) also acknowledges receipt of a copy of the Security Instrument.

NON-APPLICANT SPOUSE, OR NON-APPLICANT
INDIVIDUAL WITH OWNERSHIP INTEREST IN PROPERTY: ADDITIONAL BORROWERS

_____          _____
                          Date                                  Date

_____          _____
                          Date                                  Date

_____
                          Date

**ACKNOWLEDGMENT:**
STATE OF _California_____, COUNTY OF _Los Angeles_____ }ss.
On this _22nd_ day of _May_ , _2007_ before me _DORA ISELA GIL_
a notary public, personally appeared _Manuel Gonzalez_

_____ ~~personally known to me~~ (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/here/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal:

Signature _Nora Gsela Gil_

Name (typed or printed): _DORA ISELA GIL_

My commission expires: _11-12-09_

DORA ISELA GIL
COMM. # 1620730
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
COMM. EXPIRES NOV. 12, 2009

(seal)

SIGNADD1 (4/2006)

42

**Ex 4 pg 8 of 9**

07 13010015

00767205

## LEGAL DESCRIPTION                *EXHIBIT "A"*

THE LAND REFERRED TO HEREIN IS SITUATED IN THE STATE OF CALIFORNIA,
COUNTY OF LOS ANGELES, DESCRIBED AS FOLLOWS:

LOT 81 OF TRACT NO. 33669, IN THE CITY OF WEST COVINA, COUNTY
OF LOS ANGELES, STATE OF CALIFORNIA, AS SHOWN ON MAP FILED IN
BOOK 913, PAGE 26-32 OF MAPS, IN THE OFFICE OF THE COUNTY
RECORDER OF SAID COUNTY.

END OF LEGAL DESCRIPTION

This document was filed for recording by
Stewart Title as an accommodation only
it has not been examined as to its exe-
cution or as to its effect upon the title,
or its recordability

07 1301005

**Ex 4 pg 9 of 9**

Continued on next page

43-

# EXHIBIT 5

DRC APPRAISING

File # 1500 WIMBLEDON CT

# APPRAISAL OF REAL PROPERTY



## LOCATED AT
1500 Wimbledon Ct
West Covina, CA 91791
TR=33669 LOT 81

## FOR
MANUEL GONZALEZ

## OPINION OF VALUE
412,000

## AS OF
12/20/2011

## TABLE OF CONTENTS

GP Residential ............................................................................................................... 1
Additional Comparables .................................................................................................. 4
Plat Map ......................................................................................................................... 5
Supplemental Addendum w/sig block ............................................................................. 6
Statement of Limiting Conditions .................................................................................... 7
Subject Photos ............................................................................................................... 9
Subject Photos Interior .................................................................................................... 10
Subject Photos Interior .................................................................................................... 11
Subject Photos Interior .................................................................................................... 12
Subject Photos Interior .................................................................................................... 13
Comparable Photos 1-3 ................................................................................................... 14
Comparable Photos 4-6 ................................................................................................... 15
Building Sketch (Page - 1) ............................................................................................... 16

DRC APPRAISING

File # 1500 WIMBLEDON CT

# APPRAISAL OF REAL PROPERTY



**LOCATED AT**
1500 Wimbledon Ct
West Covina, CA 91791
TR=33669 LOT 81

**FOR**
MANUEL GONZALEZ

**OPINION OF VALUE**
412,000

**AS OF**
12/20/2011

**TABLE OF CONTENTS**

Ex 5 Pg 2 of 19

URAR APPRAISAL

Main File No. 1500 WIMBLEDON CT] Page #1

# RESTRICTED USE APPRAISAL REPORT

File No.: 1500 WIMBLEDON CT

| Property Address: 1500 Wimbledon Ct | City: West Covina | State: CA | Zip Code: 91791 |
|---|---|---|---|

County: LOS ANGELES          Legal Description: TR=33669 LOT 81

Assessor's Parcel #:   8740-022-050

Tax Year: 2011   R.E. Taxes: $ 5,384.08   Special Assessments: $ N/A   Borrower or Client: N/A

Current Owner of Record:   GONZALEZ,MANUEL   Occupant: ☒ Owner ☐ Tenant ☐ Vacant   ☐ Manufactured Housing

Project Type:  ☐ PUD  ☐ Condominium  ☐ Cooperative  ☒ Other (describe) SFR   HOA: $ N/A  ☐ per year  ☐ per month

Market Area Name:  N/A   Map Reference: 638/J3   Census Tract: 4080.02

The purpose of this appraisal is to develop an opinion of: ☒ Market Value (as defined), or ☐ other type of value (describe)

This report reflects the following value (if not Current, see comments): ☒ Current (the Inspection Date is the Effective Date)  ☐ Retrospective  ☐ Prospective

Approaches developed for this appraisal: ☒ Sales Comparison Approach  ☐ Cost Approach  ☐ Income Approach  (See Reconciliation Comments and Scope of Work)

Property Rights Appraised:  ☒ Fee Simple  ☐ Leasehold  ☐ Leased Fee  ☐ Other (describe)

Intended Use:  PERSONAL USE

Intended User(s) (by name or type):  MANUEL GONZALEZ

Client:  MANUEL GONZALEZ   Address: 1500 WIMBLEDON CT. WEST COVINA, CA. 91791

Appraiser:  DENISE CIFU   Address: 2828 COCHRAN STREET # 342 SIMI VALLEY, CA. 93065

| Location: | ☐ Urban ☒ Suburban ☐ Rural | Predominant Occupancy | One-Unit Housing | | Present Land Use | Change in Land Use |
|---|---|---|---|---|---|---|
| Built up: | ☒ Over 75% ☐ 25-75% ☐ Under 25% | | PRICE $(000) | AGE (yrs) | One-Unit 92 % | ☒ Not Likely |
| Growth rate: | ☐ Rapid ☒ Stable ☐ Slow | ☒ Owner 90 | Low 13 | | 2-4 Unit 2 % | ☐ Likely * ☐ In Process * |
| Property values: | ☐ Increasing ☒ Stable ☐ Declining | ☒ Tenant 10 | 305 | | Multi-Unit 2 % | * To: |
| Demand/supply: | ☐ Shortage ☒ In Balance ☐ Over Supply | ☒ Vacant (0-5%) | 710 High 41 | | Comm'l 4 % | |
| Marketing time: | ☐ Under 3 Mos. ☒ 3-6 Mos. ☐ Over 6 Mos. | ☐ Vacant (>5%) | 405 Pred 29 | | % | |

Market Area Boundaries, Description, and Market Conditions (including support for the above characteristics and trends):  THERE IS AN INCREASING NUMBER
OF SALES, THERE IS A DECLINING NUMBER OF LISTINGS AND THE MEDIAN COMP SALES PRICES IS REMAINING STABLE. SHORT
SALE ARE HIGHER THAN THE PREVIOUS YEAR AND REO ARE LOWER THAN THE PREVIOUS YEAR. INTEREST RATES ARE LOW.
THIS DATA IS BOUNDARY SPECIFIC AGAINST THE SUBJECT PROPERTY OVER THE PAST YEAR.

Dimensions:  SEE PLAT MAP   Site Area: 24,028 Sq.Ft.

Zoning Classification:  WCR17500*   Description: LAR1

Zoning Compliance: ☒ Legal  ☐ Legal nonconforming (grandfathered)  ☐ Illegal  ☐ No zoning

Are CC&Rs applicable? ☐ Yes ☒ No ☐ Unknown   Have the documents been reviewed? ☐ Yes ☐ No   Ground Rent (if applicable) $         /

Highest & Best Use as improved:  ☒ Present use, or  ☐ Other use (explain)

Actual Use as of Effective Date:  SFR   Use as appraised in this report:  SFR

Summary of Highest & Best Use:  TAKING CURRENT ZONING CLASSIFICATIONS INTO CONSIDERATION, THE SUBJECT'S HIGHEST AND
BEST USE AS IMPROVED IS AS A SFR AT THIS TIME

| Utilities | Public | Other | Provider/Description | Off-site Improvements | Type | Public | Private | Topography | FLAT WITH SLOPING |
|---|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | ☐ | | Street | ASPHALT | ☒ | ☐ | Size | ABOVE AVERAGE |
| Gas | ☒ | ☐ | | Curb/Gutter | CONCRETE | ☒ | ☐ | Shape | IRREGULAR |
| Water | ☒ | ☐ | | Sidewalk | CONCRETE | ☒ | ☐ | Drainage | TYPICAL |
| Sanitary Sewer | ☒ | ☐ | | Street Lights | YES | ☒ | ☐ | View | MOUNTAIN VIEW |
| Storm Sewer | ☒ | ☐ | | Alley | NONE | | | | |

Other site elements:  ☐ Inside Lot  ☐ Corner Lot  ☒ Cul de Sac  ☐ Underground Utilities  ☐ Other (describe)

FEMA Spec'l Flood Hazard Area ☐ Yes ☒ No  FEMA Flood Zone X500   FEMA Map # 06037C1895F   FEMA Map Date 09/26/2008

Site Comments:  EASEMENTS APPEAR TYPICAL FOR AREA AND THERE WERE NO APPARENT ENCROACHMENTS OR EXTERNAL
INADEQUACIES NOTED AT DATE OF INSPECTION.

| General Description | | Exterior Description | | Foundation | | Basement ☒ None | | Heating | |
|---|---|---|---|---|---|---|---|---|---|
| # of Units | 1  ☐ Acc.Unit | Foundation | CONCRETE | Slab | CONCRETE | Area Sq. Ft. | | Type | FAU |
| # of Stories | 2 | Exterior Walls | STUCCO/WD | Crawl Space | NONE | % Finished | | Fuel | GAS |
| Type ☒ Det. ☐ Att. | | Roof Surface | TILE | Basement | NONE | Ceiling | | | |
| Design (Style) | TRADITIONAL | Gutters & Dwnspts. | NONE | Sump Pump ☐ | | Walls | | Cooling | |
| ☒ Existing ☐ Proposed ☐ Und.Cons. | | Window Type | ALUM | Dampness ☐ | | Floor | | Central | CENTRAL |
| Actual Age (Yrs.) | 31 | Storm/Screens | NO / YES | Settlement | NONE NOTED | Outside Entry | | Other | |
| Effective Age (Yrs.) | 15 | | | Infestation | NONE NOTED | | | | |

| Interior Description | | Appliance | Attic ☐ None | Amenities | | Car Storage | ☐ None |
|---|---|---|---|---|---|---|---|
| Floors | TL/CRPT/GD/AVG | Refrigerator ☐ | Stairs ☐ | Fireplace(s) # 1 | Woodstove(s) # 0 | Garage # of cars ( 2  Tot.) | |
| Walls | DRYWALL/AVG. | Range/Oven ☒ | Drop Stair ☐ | Patio PATIO | | Attach. | 2 |
| Trim/Finish | WOOD/AVG. | Disposal ☒ | Scuttle ☒ | Deck DECK | | Detach. | |
| Bath Floor | CRPT/AVG. | Dishwasher ☒ | Doorway ☐ | Porch PORCH | | Blt-In | |
| Bath Wainscot | NONE | Fan/Hood ☒ | Floor ☒ | Fence WROUGHT IRON | | Carport | |
| Doors | HOLLOW/AVG. | Microwave ☒ | Heated ☐ | Pool NONE | | Driveway | 2 |
| | | Washer/Dryer ☐ | Finished ☐ | | | Surface CONCRETE | |

Finished area above grade contains:   8  Rooms   3  Bedrooms   3.00  Bath(s)   2,292  Square Feet of Gross Living Area Above Grade

Additional features:  PLANTATION SHUTTERS, CEILING FANS, REFACED FIREPLACES, UPGRADED TILE FLOORING.

Describe the condition of the property (including physical, functional and external obsolescence):  SUBJECT IS IN AVERAGE CONDITION WITH SOME
DEFERRED PHYSICAL MAINTENANCE NOTED. THERE APPEARS TO HAVE SOME TILE THAT HAS SHIFTED (SEE PHOTO). THE
EXTERIOR TRIMS NEEDS PAINTING AND THE WOOD DECK IS IN NEED OF REPAIR AND PAINTING. NO FUNCTIONAL
INADEQUACIES NOTED.

**GP RESIDENTIAL**   Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.
Form GPRES2 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE                                                                          3/2007

47

Ex 5 Pg 3 of 19

# RESTRICTED USE APPRAISAL REPORT

File No.: 1500 WIMBLEDON CT

My research ☐ did ☒ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.

Data Source(s): NDCDATA

| 1st Prior Subject Sale/Transfer | Analysis of sale/transfer history and/or any current agreement of sale/listing: THE SUBJECT PROPERTY HAD NO |
|---|---|
| Date: 02/13/2002 | SALES OR TRANSFERS IN THE LAST 36 MONTHS. |
| Price: 208,000 | |
| Source(s): NDC DATA | |
| 2nd Prior Subject Sale/Transfer | |
| Date: 06/20/1990 | |
| Price: 299,500 | |
| Source(s): NDC DATA | |

## SALES COMPARISON APPROACH TO VALUE (if developed)    ☐ The Sales Comparison Approach was not developed for this appraisal.

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | +(-) $ Adjust. | COMPARABLE SALE # 2 | +(-) $ Adjust. | COMPARABLE SALE # 3 | +(-) $ Adjust. |
|---|---|---|---|---|---|---|---|
| Address | 1500 Wimbledon Ct West Covina, CA 91791 | 1608 S Grenoble Ave West Covina, CA 91791 | | 1708 E Doublegrove St West Covina, CA 91791 | | 1815 S LARK ELLEN AVE WEST COVINA, CA 91791 | |
| Proximity to Subject | | 0.14 miles S | | 0.19 miles S | | 0.72 miles SW | |
| Sale Price | $ 208,000 | $ 415,000 | | $ 426,000 | | $ 375,000 | |
| Sale Price/GLA | $ 90.75 /sq.ft. | $ 175.92 /sq.ft. | | $ 166.47 /sq.ft. | | $ 147.35 /sq.ft. | |
| Data Source(s) | NDC DATA | DOC# 1328806 | | DOC# 1300779 | | DOC# 897544 | |
| Verification Source(s) | OWNER | APN# 8740-021-007 | | APN# 8740-021-018 | | APN# 8740-009-006 | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjust. | DESCRIPTION | +(-) $ Adjust. | DESCRIPTION | +(-) $ Adjust. |
| Sales or Financing | N/A | CONVENTIONAL | | CONVENTIONAL | | CONVENTIONAL | |
| Concessions | N/A | MORTGAGE | | MORTGAGE | | MORTGAGE | |
| Date of Sale/Time | N/A | 09/30/2011 | | 09/28/2011 | | 07/01/2011 | |
| Rights Appraised | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Location | AVERAGE | AVERAGE | | AVERAGE | | BUSY STREET | +10,000 |
| Site | 12,014 Sq.Ft. | 9,438 Sq.Ft. | +7,728 | 8,798 Sq.Ft. | +9,648 | 9,354 Sq.Ft. | +7,980 |
| View | MOUNTAIN VIEW | MOUNTAIN VIEW | | MOUNTAIN VIEW | | NO VIEW | +15,000 |
| Design (Style) | TRADITIONAL | TRADITIONAL | | TRADITIONAL | | TRADITIONAL | |
| Quality of Construction | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Age | 31 | 31 | | 31 | | 34 | |
| Condition | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Above Grade | Total 8 / Bdrms 3 / Baths 3.00 | Total 11 / Bdrms 4 / Baths 3.00 | -10,000 | Total 11 / Bdrms 4 / Baths 2.25 | -10,000 | Total 12 / Bdrms 4 / Baths 3.0 | -10,000 |
| Room Count | | | | | | | |
| Gross Living Area | 2,292 sq.ft. | 2,359 sq.ft. | | 2,559 sq.ft. | -14,685 | 2,545 sq.ft. | -13,915 |
| Basement & Finished | N/A | N/A | | N/A | | N/A | |
| Rooms Below Grade | N/A | N/A | | N/A | | N/A | |
| Functional Utility | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Heating/Cooling | FAU/CENTRAL | FAU/CENTRAL | | FAU/CENTRAL | | FAU/CENTRAL | |
| Energy Efficient Items | STANDARD | STANDARD | | STANDARD | | STANDARD | |
| Garage/Carport | 2 CAR GARAGE | 2 CAR GARAGE | | 2 CAR GARAGE | | 2 CAR GARAGE | |
| Porch/Patio/Deck | PRCH/PAT/DEK | PRCH/PAT/DEK | | PRCH/PAT/DEK | | PRCH/PAT/DEK | |
| FIREPLACE | 2 FIREPLACES | 2 FIREPLACES | | FIREPLACE | +5,000 | FIREPLACE | +5,000 |
| POOL/SPA | NONE/NONE | NONE/NONE | | NONE/NONE | | NONE/NONE | |
| DOM | N/A | 137 | | 167 | | 123 | |
| Net Adjustment (Total) | | ☐ + ☒ - | $ -2,272 | ☐ + ☒ - | $ -10,037 | ☒ + ☐ - | $ 14,065 |
| Adjusted Sale Price of Comparables | | | $ 412,728 | | $ 415,963 | | $ 389,065 |

Summary of Sales Comparison Approach    ALL SALES USED WERE CONSIDERED TO BE THE BEST AVAILABLE AT THE TIME OF INSPECTION. ADJUSTMENTS WERE WARRANTED FOR THE DIFFERENCES. THE SUBJECT PROPERTY SITS ON A LOT THAT SLOPS DOWNWARD ON THE RIGHT SIDE WHEN FACING THE HOUSE. THIS AREA IS NOT USEABLE. APPRAISER ESTIMATES THIS AREA AT 12,014 LOT SIZE BEING USABLE, THAT IS HALF THE LOT SIZE. APPRAISER MADE ADJUSTMENTS ON THE USABLE LOT SIZE.
TAX ROLLS IDENTIFY THERE ARE 4 BEDROOMS, UPON INSPECTION THERE IS ONLY 3 BEDROOMS. THE HOUSE HAS A LOFT AND THE BUILDER HAD THE OPTION TO BUILD AS A LOFT OR AN ADDITIONAL 4TH BEDROOM. 3 BEDROOMS WERE USED IN THE GRID FOR ADJUSTMENTS.

Indicated Value by Sales Comparison Approach $ 412,000

**GP RESIDENTIAL**    Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.
Form GPRES2 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE    3/2007

48

Ex 5 Pg 4 of 19

# RESTRICTED USE APPRAISAL REPORT

File No.: 1500 WIMBLEDON CT

| COST APPROACH TO VALUE (if developed) | ☒ The Cost Approach was not developed for this appraisal. |
|---|---|

Provide adequate information for replication of the following cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value): _____

| ESTIMATED ☐ REPRODUCTION OR ☐ REPLACEMENT COST NEW | OPINION OF SITE VALUE | | | =$ |
|---|---|---|---|---|
| Source of cost data: | DWELLING | Sq.Ft. @ $ | | =$ |
| Quality rating from cost service:     Effective date of cost data: | | Sq.Ft. @ $ | | =$ |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.): | | Sq.Ft. @ $ | | =$ |
| | | Sq.Ft. @ $ | | =$ |
| | | Sq.Ft. @ $ | | =$ |
| | | | | =$ |
| | Garage/Carport | Sq.Ft. @ $ | | =$ |
| | Total Estimate of Cost-New | | | =$ |
| | Less    Physical | Functional | External | |
| | Depreciation | | | =$( ) |
| | Depreciated Cost of Improvements | | | =$ |
| | "As-Is" Value of Site Improvements | | | =$ |
| | | | | =$ |
| | | | | =$ |
| Estimated Remaining Economic Life (if required):     Years | INDICATED VALUE BY COST APPROACH | | | =$ |

| INCOME APPROACH TO VALUE (if developed) | ☒ The Income Approach was not developed for this appraisal. |
|---|---|

Estimated Monthly Market Rent $ _____ X Gross Rent Multiplier _____ = $ _____    **Indicated Value by Income Approach**

Summary of Income Approach (including support for market rent and GRM): _____

| PROJECT INFORMATION FOR PUDs (if applicable) | ☐ The Subject is part of a Planned Unit Development. |
|---|---|

Legal Name of Project: _____

Describe common elements and recreational facilities: _____

Indicated Value by: Sales Comparison Approach $ 412,000    Cost Approach (if developed) $ _____    Income Approach (if developed) $ _____

Final Reconciliation  THE FINAL RECONCILIATION VALUE GIVES MAJOR CREDENCE TO THE SALES COMPARISON ANALYSIS BECAUSE IT BEST REFLECTS THE REACTIONS OF THE TYPICAL BUYER OF THE SUBJECT PROPERTY. MOST WEIGHT WAS GIVEN TO COMPARABLE 1. COMPARABLE 1 HAS SIMILAR GLA AND AMENITIES. THE COST APPROACH IS NOT APPLICABLE. THE INCOME APPROACH IS NOT APPLICABLE.

This appraisal is made ☒ "as is", ☐ subject to completion per plans and specifications on the basis of a Hypothetical Condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a Hypothetical Condition that the repairs or alterations have been completed, ☐ subject to the following required inspection based on the Extraordinary Assumption that the condition or deficiency does not require alteration or repair: _____

☒ This report is also subject to other Hypothetical Conditions and/or Extraordinary Assumptions as specified in the attached addenda.

Based on the degree of inspection of the subject property, as indicated below, defined Scope of Work, Statement of Assumptions and Limiting Conditions, and Appraiser's Certifications, my (our) Opinion of the Market Value (or other specified value type), as defined herein, of the real property that is the subject of this report is: $ 412,000 , as of: 12/20/2011 , which is the effective date of this appraisal. If indicated above, this Opinion of Value is subject to Hypothetical Conditions and/or Extraordinary Assumptions included in this report. See attached addenda.

A true and complete copy of this report contains 20 pages, including exhibits which are considered an integral part of the report. This appraisal report may not be properly understood without reference to the information contained in the complete report.

Attached Exhibits:
☒ Scope of Work    ☒ Limiting Cond./Certifications    ☐ Narrative Addendum    ☒ Photograph Addenda    ☒ Sketch Addendum
☒ Map Addenda    ☒ Additional Sales    ☐ Cost Addendum    ☐ Flood Addendum    ☐ Manuf. House Addendum
☐ Hypothetical Conditions    ☒ Extraordinary Assumptions    ☒ INVOICE    ☐    ☐

Client Contact: MANUEL GONZALEZ    Client Name: MANUEL GONZALEZ
E-Mail: MANNY1@CHARTER.NET    Address: 1500 WIMBLEDON CT. WEST COVINA, CA. 91791

| APPRAISER | SUPERVISORY APPRAISER (if required) or CO-APPRAISER (if applicable) |
|---|---|
| Appraiser Name: DENISE CIFU | Supervisory or Co-Appraiser Name: _____ |
| Company: DRC APPRAISING | Company: _____ |
| Phone: 805-520-0333    Fax: 805-527-3520 | Phone: _____    Fax: _____ |
| E-Mail: DENISECIFU@YAHOO.COM | E-Mail: _____ |
| Date of Report (Signature): 12/28/2011 | Date of Report (Signature): _____ |
| License or Certification #: AR 027999    State: CA | License or Certification #: _____    State: _____ |
| Designation: RESIDENTIAL APPRAISER | Designation: _____ |
| Expiration Date of License or Certification: 03/11/2013 | Expiration Date of License or Certification: _____ |
| Inspection of Subject: ☒ Interior & Exterior ☐ Exterior Only ☐ None | Inspection of Subject: ☐ Interior & Exterior ☐ Exterior Only ☐ None |
| Date of Inspection: 12/20/2011 | Date of Inspection: _____ |

Copyright© 2007 by a la mode, inc. This form may be reproduced unmodified without written permission, however, a la mode, inc. must be acknowledged and credited.

**GP RESIDENTIAL**    Form GPRES2 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE    3/2007

Ex 5 Pg 5 of 19

Main File No. 1500 WIMBLEDON CT| Page #4

## ADDITIONAL COMPARABLE SALES

File No.: 1500 WIMBLEDON CT

| FEATURE | SUBJECT | COMPARABLE SALE #4 | | COMPARABLE SALE #5 | | COMPARABLE SALE #6 | |
|---|---|---|---|---|---|---|---|
| Address | 1500 Wimbledon Ct | 1252 E Shalene St | | 2019 Edenview Ln | | 1913 Cumberland Dr | |
| | West Covina, CA 91791 | West Covina, CA 91792 | | West Covina, CA 91792 | | West Covina, CA 91792 | |
| Proximity to Subject | | 0.94 miles SW | | 0.98 miles SW | | 0.65 miles SW | |
| Sale Price | $ 208,000 | $ 435,000 | | $ 439,000 | | $ 365,000 | |
| Sale Price/GLA | $ 90.75 /sq.ft. | $ 227.63 /sq.ft. | | $ 229.72 /sq.ft. | | $ 180.16 /sq.ft. | |
| Data Source(s) | NDC DATA | DOC# 1218809 | | MLS# C11121879 | | MLS# 11550569 | |
| Verification Source(s) | OWNER | APN# 8743-012-007 | | APN# 8743-009-018 | | APN# 8743-025-030 | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjust. | DESCRIPTION | +(-) $ Adjust. | DESCRIPTION | +(-) $ Adjust. |
| Sales or Financing | N/A | CONVENTIONAL | | N/A | | N/A | |
| Concessions | N/A | MORTGAGE | | N/A | | N/A | |
| Date of Sale/Time | N/A | 09/08/2011 | | ACTIVE | -10,975 | BACK UP | -9,125 |
| Rights Appraised | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Location | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Site | 12,014 Sq.Ft. | 8,973 Sq.Ft. | +9,123 | 5,354 Sq.Ft. | +19,980 | 6,980 Sq.Ft. | +15,102 |
| View | MOUNTAIN VIEW | NO VIEW | +15,000 | NO VIEW | +15,000 | MOUNTAIN VIEW | |
| Design (Style) | TRADITIONAL | TRADITIONAL | | TRADITIONAL | | TRADITIONAL | |
| Quality of Construction | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Age | 31 | 41 | | 41 | | 32 | |
| Condition | AVERAGE | AVERAGE | | SUPERIOR | -40,000 | INFERIOR | +40,000 |
| Above Grade | Total 8 / Bdrms 3 / Baths 3.00 | Total 8 / Bdrms 3 / Baths 2.5 | | Total 10 / Bdrms 4 / Baths 3.00 | -10,000 | Total 10 / Bdrms 3 / Baths 3.00 | |
| Room Count | | | | | | | |
| Gross Living Area | 2,292 sq.ft. | 1,911 sq.ft. | +20,955 | 1,911 sq.ft. | +20,955 | 2,026 sq.ft. | +14,630 |
| Basement & Finished | N/A | N/A | | N/A | | N/A | |
| Rooms Below Grade | N/A | N/A | | N/A | | N/A | |
| Functional Utility | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Heating/Cooling | FAU/CENTRAL | FAU/CENTRAL | | FAU/CENTRAL | | FAU/CENTRAL | |
| Energy Efficient Items | STANDARD | STANDARD | | STANDARD | | STANDARD | |
| Garage/Carport | 2 CAR GARAGE | 2 CAR GARAGE | | 2 CAR GARAGE | | 2 CAR GARAGE | |
| Porch/Patio/Deck | PRCH/PAT/DEK | PRCH/PAT/DEK | | PRCH/PAT/DEK | | PORCH/PATIO | +5,000 |
| FIREPLACE | 2 FIREPLACES | FIREPLACE | +5,000 | FIREPLACES | +5,000 | 2 FIREPLACES | |
| POOL/SPA | NONE/NONE | POOL/NONE | -25,000 | NONE/NONE | | NONE/NONE | |
| DOM | N/A | 13 | | 96 | | 115 | |
| Net Adjustment (Total) | | ☒ + ☐ - $ 25,078 | | ☐ + ☒ - $ -40 | | ☒ + ☐ - $ 65,607 | |
| Adjusted Sale Price of Comparables | | $ 460,078 | | $ 438,960 | | $ 430,607 | |

Summary of Sales Comparison Approach

Copyright© 2007 by a la mode, Inc. This form may be reproduced unmodified without written permission, however, a la mode, Inc. must be acknowledged and credited.
Form GPRES2.(AC) — "WinTOTAL" appraisal software by a la mode, Inc. — 1-800-ALAMODE        3/2007

**GP RESIDENTIAL**

ua    50        Ex 5 Pg 6 of 19

Main File No. 1500 WIMBLEDON CT| Page #5

## Plat Map

| Borrower/Client | N/A | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1500 Wimbledon Ct | | | | | |
| City | West Covina | County | LOS ANGELES | State | CA | Zip Code 91791 |
| Lender | N/A | | | | | |



Form MAP.PLAT — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Ex 5 pg 7 of 19

51

Main File No. 1500 WIMBLEDON CT | Page #6

## Supplemental Addendum

File No. 1500 WIMBLEDON CT

| Borrower/Client | N/A | | | |
|---|---|---|---|---|
| Property Address | 1500 Wimbledon Ct | | | |
| City | West Covina | County LOS ANGELES | State CA | Zip Code 91791 |
| Lender | N/A | | | |

THE PURPOSE OF THIS APPRAISAL IS TO ESTIMATE THE FAIR MARKET VALUE IN TERMS OF CASH, FOR THE FEE SIMPLE INTEREST OF THE SUBJECT PROPERTY. ON BEHALF OF THE APPRAISAL COMPANY FACILITATING THE ASSIGNMENT FOR THE REFERENCED CLIENT AS THE INTENDED USER OF THE REPORT. THE ONLY FUNCTION OF THE APPRAISAL IS TO ASSIST THE CLIENT MENTIONED IN THE REPORT IN EVALUATION OF THE SUBJECT PROPERTY TO DETERMINE CURRENT MARKET VALUE. THIS APPRAISAL IS IN CONFORMITY WITH UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE. THE APPRAISER INTENDS NO OTHER USE.

Scope of Work: THE SCOPE OF WORK INCLUDED DETERMINING AN OPINION OF VALUE BY OBSERVING NEIGHBORHOOD CHARACTERISTICS, EVALUATING MARKETABILITY OF PROPERTIES AS TO CONFORMITY, PHYSICAL AND ECONOMIC CONDITIONS, AND REVIEWED HIGHEST AND BEST USE. SALES AND PROPERTY DATA FOR THIS ANALYSIS WERE GATHERED FOR THE SUBJECT PROPERTY AND COMPARABLES VIA NDC DATA AND MULTIPLE LISTING SERVICE (MLS). A PERSONAL INSPECTION OF THE EXTERIOR AND INTERIOR OF THE SUBJECT WITH PHOTOS WAS CONDUCTED. THE DATA WAS THEN USED TO DEVELOP THE SALES MARKET ANALYSIS AND THE SALES COMPARISON APPROACH. THE APPRAISER FOUND THE COST APPROACH TO BE N/A AND THE INCOME APPROACH WAS NOT DEVELOPED DUE TO LACK OF RECENTLY SOLD RENTALS AND INADEQUATE SUPPORT FOR GROSS RENT MULTIPLIER. THE DATA SOURCES ARE CONSIDERED TO BE RELIABLE. A EXTRAORDINARY ASSUMPTIONS HAS BEEN MADE.

EXTRAORDINARY CONDITION: IT IS ASSUMED THAT ALL STRUCTURES, GIVEN VALUE IN THIS REPORT ARE LEGALLY PERMITTED AS STATED IN THIS REPORT. IT IS ASSUMED THAT THERE ARE NO UNKNOWN GEOLOGICAL AND OR ENVIRONMENTAL ADVERSE ISSUES. THE PHYSICAL CHARACTERISTICS OF THE COMPARABLES WERE EITHER VERIFIED THROUGH COUNTY RECORDS, MLS AND ASSUMED TO BE AS STATED. THE COMPARABLES ARE ASSUMED TO HAVE NO SALES CONCESSIONS. THE CURRENT ZONING AND FLOOD ZONE ARE ASSUMED TO BE AS STATED IN THIS REPORT. IF ANY OF THESE ITEMS ARE FOUND TO BE NOT TRUE OR CORRECT, I RESERVE THE RIGHT TO CHANGE MY APPRAISAL.

UNLESS OTHERWISE NOTED, ALL MARKET GRID ADJUSTMENTS ARE DEEMED TO BE SELF EXPLANATORY, BUT ALL ADJUSTMENTS TO THE COMPARABLES SALES REFLECT THE APPRAISER'S BEST ESTIMATES OF THE MARKET'S REACTION TO THE DIFFERENCES BETWEEN THE SUBJECT PROPERTY AND THE COMPARABLES. THROUGH PAIRED SALES ANALYSIS IS CONDUCTED TO THE DEGREE THAT THE AVAILABLE DATA ALLOWS, IN MOST CASES, DATA IS TOO LIMITED TO BE CONCLUSIVELY DEFINITIVE AND THE ADJUSTMENTS ARE AS MUCH "QUALITATIVE" (REFLECTING GENERAL POSITIVE OR NEGATIVE MARKET INFLUENCES) AS THEY ARE "QUANTITATIVE" (IRREFUTABLY DERIVED FROM HAD CORE DATA AND INFORMATION). THE ADJUSTMENT VALUES UTILIZED ARE REASONABLE RELATIVE TO THE LIMITED AMOUNT OF DATA THAT IS TYPICALLY AVAILABLE, AS WELL AS TO ANTICIPATED MARKET REACTIONS TO VARIOUS CHARACTERISTICS AS IS NOTED THROUGH EXPERIENCE IN THIS AND LIKE MARKETS AND INPUT FROM LOCAL BROKERS.

DATA IS VERIFIED THROUGH SEVERAL DATA SOURCES. WHEN THERE IS CONFLICTING DATA THE APPRAISER USES THE DATA THAT SEEMS TO BE REPRESENTED AND VERIFIED BY OTHER SOURCES / AGENTS. DATA OBTAINED IS A CULMINATION OF INTELLECTUAL EDUCATION, PROFESSIONAL EXPERIENCE AND PERSONAL INVESTIGATION. WHEN DATA IS UNAVAILABLE, THE APPRAISER USED AN EDUCATED ASSUMPTION.

Deeds for: 1500 WIMBLEDON CT - WEST COVINA, 91791-4047

| Sale | Transaction | Date | Document | Amount | Loan Amount | From | To | Type |
|---|---|---|---|---|---|---|---|---|
| | refi | 05/30/2007 | 0001301005 | 0 | 120,000 | | GONZALEZ,MANUEL | deed of trust |
| | refi | 07/12/2006 | 0001535641 | 0 | 529,750 | | GONZALEZ,MANUEL | deed of trust |
| | refi | 11/07/2005 | 0002687698 | 0 | 123,000 | | GONZALEZ,MANUEL | deed of trust |
| | refi | 11/29/2004 | 0003074693 | 0 | 58,000 | | GONZALEZ,MANUEL | deed of trust |
| | refi | 09/23/2004 | 0002452263 | 0 | 30,000 | | GONZALEZ,MANUEL | deed of trust |
| | refi | 07/30/2004 | 0001959835 | 0 | 372,000 | GONZALEZ,ARTHUR | GONZALEZ,MANUEL | grant deed/deed of trust |
| | refi | 07/10/2003 | 0001974365 | 0 | 35,000 | | GONZALEZ,MANUEL | deed of trust |
| | refi | 02/28/2003 | 0000584222 | 0 | 205,711 | | GONZALEZ,MANUEL | deed of trust |
| X | resale | 02/13/2002 | 0000346330 | 208,000 | 204,392 | GONZALEZ,JOSE L & BLANCA R | GONZALEZ,MANUEL | grant deed/deed of trust |
| X | | 06/20/1990 | 1093648 | 299,500 | 0 | | GONZALEZ,JOSE L & BLANCA R | |

| | | | |
|---|---|---|---|
| Signature | | Signature | |
| Name DENISE CIFU | | Name | |
| Date Signed 12/28/2011 | | Date Signed | |
| State Certification # AR 027999 | State CA | State Certification # | State |
| Or State License # | State | Or State License # | State |

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he considers his own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

> * Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgement.

## STATEMENT OF LIMITING CONDITIONS AND APPRAISER'S CERTIFICATION

**CONTINGENT AND LIMITING CONDITIONS:** The appraiser's certification that appears in the appraisal report is subject to the following conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it. The appraiser assumes that the title is good and marketable and, therefore, will not render any opinions about the title. The property is appraised on the basis of it being under responsible ownership.

2. The appraiser has provided a sketch in the appraisal report to show approximate dimensions of the improvements and the sketch is included only to assist the reader of the report in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in the appraisal report whether the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand.

5. The appraiser has estimated the value of the land in the cost approach at its highest and best use and the improvements at their contributory value. These separate valuations of the land and improvements must not be used in conjunction with any other appraisal and are invalid if they are so used.

6. The appraiser has noted in the appraisal report any adverse conditions (such as, needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the normal research involved in performing the appraisal. Unless otherwise stated in the appraisal report, the appraiser has no knowledge of any hidden or unapparent conditions of the property or adverse environmental conditions (including the presence of hazardous wastes, toxic substances, etc.) that would make the property more or less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied, regarding the condition of the property. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, the appraisal report must not be considered as an environmental assessment of the property.

7. The appraiser obtained the information, estimates, and opinions that were expressed in the appraisal report from sources that he or she considers to be reliable and believes them to be true and correct. The appraiser does not assume responsibility for the accuracy of such items that were furnished by other parties.

8. The appraiser will not disclose the contents of the appraisal report except as provided for in the Uniform Standards of Professional Appraisal Practice.

9. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that completion of the improvements will be performed in a workmanlike manner.

10. The appraiser must provide his or her prior written consent before the lender/client specified in the appraisal report can distribute the appraisal report (including conclusions about the property value, the appraiser's identity and professional designations, and references to any professional appraisal organizations or the firm with which the appraiser is associated) to anyone other than the borrower; the mortgagee or its successors and assigns; the mortgage insurer; consultants; professional appraisal organizations; any state or federally approved financial institution; or any department, agency, or instrumentality of the United States or any state or the District of Columbia; except that the lender/client may distribute the property description section of the report only to data collection or reporting service(s) without having to obtain the appraiser's prior written consent. The appraiser's written consent and approval must also be obtained before the appraisal can be conveyed by anyone to the public through advertising, public relations, news, sales, or other media.

DRC APPRAISING
Form ACR — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Ex 5 Pg 9 of 19

53

Main File No. 1500 WIMBLEDON CT| Page #8

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1.  I have researched the subject market area and have selected a minimum of three recent sales of properties most similar and proximate to the subject property for consideration in the sales comparison analysis and have made a dollar adjustment when appropriate to reflect the market reaction to those items of significant variation. If a significant item in a comparable property is superior to, or more favorable than, the subject property, I have made a negative adjustment to reduce the adjusted sales price of the comparable and, if a significant item in a comparable property is inferior to, or less favorable than the subject property, I have made a positive adjustment to increase the adjusted sales price of the comparable.

2.  I have taken into consideration the factors that have an impact on value in my development of the estimate of market value in the appraisal report. I have not knowingly withheld any significant information from the appraisal report and I believe, to the best of my knowledge, that all statements and information in the appraisal report are true and correct.

3.  I stated in the appraisal report only my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the contingent and limiting conditions specified in this form.

4.  I have no present or prospective interest in the property that is the subject to this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or the estimate of market value in the appraisal report on the race, color, religion, sex, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property.

5.  I have no present or contemplated future interest in the subject property, and neither my current or future employment nor my compensation for performing this appraisal is contingent on the appraised value of the property.

6.  I was not required to report a predetermined value or direction in value that favors the cause of the client or any related party, the amount of the value estimate, the attainment of a specific result, or the occurrence of a subsequent event in order to receive my compensation and/or employment for performing the appraisal. I did not base the appraisal report on a requested minimum valuation, a specific valuation, or the need to approve a specific mortgage loan.

7.  I performed this appraisal in conformity with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place as of the effective date of this appraisal, with the exception of the departure provision of those Standards, which does not apply. I acknowledge that an estimate of a reasonable time for exposure in the open market is a condition in the definition of market value and the estimate I developed is consistent with the marketing time noted in the neighborhood section of this report, unless I have otherwise stated in the reconciliation section.

8.  I have personally inspected the interior and exterior areas of the subject property and the exterior of all properties listed as comparables in the appraisal report. I further certify that I have noted any apparent or known adverse conditions in the subject improvements, on the subject site, or on any site within the immediate vicinity of the subject property of which I am aware and have made adjustments for these adverse conditions in my analysis of the property value to the extent that I had market evidence to support them. I have also commented about the effect of the adverse conditions on the marketability of the subject property.

9.  I personally prepared all conclusions and opinions about the real estate that were set forth in the appraisal report. If I relied on significant professional assistance from any individual or individuals in the performance of the appraisal or the preparation of the appraisal report, I have named such individual(s) and disclosed the specific tasks performed by them in the reconciliation section of this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in the report; therefore, if an unauthorized change is made to the appraisal report, I will take no responsibility for it.

**SUPERVISORY APPRAISER'S CERTIFICATION:** If a supervisory appraiser signed the appraisal report, he or she certifies and agrees that: I directly supervise the appraiser who prepared the appraisal report, have reviewed the appraisal report, agree with the statements and conclusions of the appraiser, agree to be bound by the appraiser's certifications numbered 4 through 7 above, and am taking full responsibility for the appraisal and the appraisal report.

**ADDRESS OF PROPERTY APPRAISED:** _1500 Wimbledon Ct, West Covina, CA 91791_

| **APPRAISER:** | **SUPERVISORY APPRAISER (only if required):** |
|---|---|
| Signature: | Signature: |
| Name: _DENISE CIFU_ | Name: |
| Date Signed: _12/28/2011_ | Date Signed: |
| State Certification #: _AR 027999_ | State Certification #: |
| or State License #: | or State License #: |
| State: _CA_ | State: |
| Expiration Date of Certification or License: _03/11/2013_ | Expiration Date of Certification or License: |

☐ Did    ☐ Did Not Inspect Property

54

Ex 5 Pg 10 of 19

## Subject Photo Page

| Borrower/Client | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 1500 Wimbledon Ct | | | | | | |
| City | West Covina | County | LOS ANGELES | State | CA | Zip Code | 91791 |
| Lender | N/A | | | | | | |



**Subject Front**

1500 Wimbledon Ct
| | |
|---|---|
| Sales Price | 208,000 |
| Gross Living Area | 2,292 |
| Total Rooms | 8 |
| Total Bedrooms | 3 |
| Total Bathrooms | 3.00 |
| Location | AVERAGE |
| View | MOUNTAIN VIEW |
| Site | 12,014 Sq.Ft. |
| Quality | AVERAGE |
| Age | 31 |



**Subject Rear**



**Subject Street**

Ex 5 pg 11 of 19

Main File No. 1500 WIMBLEDON CT| Page # 10|

## Subject Interior Photo Page

| Borrower/Client | N/A | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1500 Wimbledon Ct | | | | | |
| City | West Covina | County | LOS ANGELES | State | CA | Zip Code 91791 |
| Lender | N/A | | | | | |



### Subject Kitchen

| | |
|---|---|
| 1500 Wimbledon Ct | |
| Sales Price | 208,000 |
| Gross Living Area | 2,292 |
| Total Rooms | 8 |
| Total Bedrooms | 3 |
| Total Bathrooms | 3.00 |
| Location | AVERAGE |
| View | MOUNTAIN VIEW |
| Site | 12,014 Sq.Ft. |
| Quality | AVERAGE |
| Age | 31 |



### Subject Living Room



### Subject Dining Room

Ex 5 p 12 of 19

Main File No. 1500 WIMBLEDON CT| Page #11

## Subject Interior Photo Page

| Borrower/Client | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 1500 Wimbledon Ct | | | | | | |
| City | West Covina | County | LOS ANGELES | State | CA | Zip Code | 91791 |
| Lender | N/A | | | | | | |



### Subject Wet Bar

1500 Wimbledon Ct

| | |
|---|---|
| Sales Price | 208,000 |
| Gross Living Area | 2,292 |
| Total Rooms | 8 |
| Total Bedrooms | 3 |
| Total Bathrooms | 3.00 |
| Location | AVERAGE |
| View | MOUNTAIN VIEW |
| Site | 12,014 Sq.Ft. |
| Quality | AVERAGE |
| Age | 31 |



### Subject Fireplace



### Subject Bathroom

Ex 5 pg 13 of 19

## Subject Interior Photo Page

| Borrower/Client | N/A | | | | |
|---|---|---|---|---|---|
| Property Address | 1500 Wimbledon Ct | | | | |
| City | West Covina | County LOS ANGELES | State CA | Zip Code 91791 |
| Lender | N/A | | | | |



### Subject Bathroom

| | |
|---|---|
| 1500 Wimbledon Ct | |
| Sales Price | 208,000 |
| Gross Living Area | 2,292 |
| Total Rooms | 8 |
| Total Bedrooms | 3 |
| Total Bathrooms | 3.00 |
| Location | AVERAGE |
| View | MOUNTAIN VIEW |
| Site | 12,014 Sq.Ft. |
| Quality | AVERAGE |
| Age | 31 |



**Subject Master Bedroom**



**Subject Bathroom**

Ex 5 pg 14 of 19

Main File No. 1500 WIMBLEDON CT| Page #13

## Subject Exterior Photo Page

| Borrower/Client | N/A | | | | |
|---|---|---|---|---|---|
| Property Address | 1500 Wimbledon Ct | | | | |
| City | West Covina | County LOS ANGELES | State CA | Zip Code 91791 | |
| Lender | N/A | | | | |



**Subject Tile Damaged**

1500 Wimbledon Ct

| | |
|---|---|
| Sales Price | 208,000 |
| Gross Living Area | 2,292 |
| Total Rooms | 8 |
| Total Bedrooms | 3 |
| Total Bathrooms | 3.00 |
| Location | AVERAGE |
| View | MOUNTAIN VIEW |
| Site | 12,014 Sq.Ft. |
| Quality | AVERAGE |
| Age | 31 |



**Subject View**



**Subject Deck**

Ex 5 Pg 15 of 19

Main File No. 1500 WIMBLEDON CT] Page #14

## Comparable Photo Page

| Borrower/Client | N/A | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 1500 Wimbledon Ct | | | | | |
| City | West Covina | County | LOS ANGELES | State | CA | Zip Code | 91791 |
| Lender | N/A | | | | | |



### Comparable 1
**1608 S Grenoble Ave**
| | |
|---|---|
| Prox. to Subject | 0.14 miles S |
| Sales Price | 415,000 |
| Gross Living Area | 2,359 |
| Total Rooms | 11 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3.00 |
| Location | AVERAGE |
| View | MOUNTAIN VIEW |
| Site | 9,438 Sq.Ft. |
| Quality | AVERAGE |
| Age | 31 |



### Comparable 2
**1708 E Doublegrove St**
| | |
|---|---|
| Prox. to Subject | 0.19 miles S |
| Sales Price | 426,000 |
| Gross Living Area | 2,559 |
| Total Rooms | 11 |
| Total Bedrooms | 4 |
| Total Bathrooms | 2.25 |
| Location | AVERAGE |
| View | MOUNTAIN VIEW |
| Site | 8,798 Sq.Ft. |
| Quality | AVERAGE |
| Age | 31 |



### Comparable 3
**1815 S LARK ELLEN AVE**
| | |
|---|---|
| Prox. to Subject | 0.72 miles SW |
| Sales Price | 375,000 |
| Gross Living Area | 2,545 |
| Total Rooms | 12 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3.0 |
| Location | BUSY STREET |
| View | NO VIEW |
| Site | 9,354 Sq.Ft. |
| Quality | AVERAGE |
| Age | 34 |

Ex 5 pg 16 of 19

## Comparable Photo Page

| | | | | |
|---|---|---|---|---|
| Borrower/Client | N/A | | | |
| Property Address | 1500 Wimbledon Ct | | | |
| City | West Covina | County LOS ANGELES | State CA | Zip Code 91791 |
| Lender | N/A | | | |



**Comparable 4**

1252 E Shelene St
| | |
|---|---|
| Prox. to Subject | 0.94 miles SW |
| Sales Price | 435,000 |
| Gross Living Area | 1,911 |
| Total Rooms | 8 |
| Total Bedrooms | 3 |
| Total Bathrooms | 2.5 |
| Location | AVERAGE |
| View | NO VIEW |
| Site | 8,973 Sq.Ft. |
| Quality | AVERAGE |
| Age | 41 |



**Comparable 5**

2019 Edenview Ln
| | |
|---|---|
| Prox. to Subject | 0.98 miles SW |
| Sales Price | 439,000 |
| Gross Living Area | 1,911 |
| Total Rooms | 10 |
| Total Bedrooms | 4 |
| Total Bathrooms | 3.00 |
| Location | AVERAGE |
| View | NO VIEW |
| Site | 5,354 Sq.Ft. |
| Quality | AVERAGE |
| Age | 41 |



**Comparable 6**

1913 Cumberland Dr
| | |
|---|---|
| Prox. to Subject | 0.65 miles SW |
| Sales Price | 365,000 |
| Gross Living Area | 2,026 |
| Total Rooms | 10 |
| Total Bedrooms | 3 |
| Total Bathrooms | 3.00 |
| Location | AVERAGE |
| View | MOUNTAIN VIEW |
| Site | 6,980 Sq.Ft. |
| Quality | AVERAGE |
| Age | 32 |

Ex 5 Pg 17 of 19

Main File No. 1500 WIMBLEDON CT| Page #16

## Building Sketch

| Borrower/Client | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 1500 Wimbledon Ct | | | | | | |
| City | West Covina | County LOS ANGELES | | State CA | Zip Code 91791 | |
| Lender | N/A | | | | | | |



| Area Calculations Summary | | |
|---|---|---|
| **Living Area:** | | **Calculation Details** |
| First Floor | 1335.5 Sq ft | 19.8 × 15.9 = 314.82 |
| | | 28.1 × 22.9 = 643.49 |
| | | 17.2 × 14.1 = 242.52 |
| | | 15.3 × 8.8 = 134.64 |
| Second Floor | 956.9 Sq ft | 23 × 27.9 = 641.7 |
| | | 16 × 19.7 = 315.2 |
| **Total Living Area (Rounded):** | **2292 Sq ft** | |
| **Non-Living Area** | | |
| Wood Deck | 103.7 Sq ft | 16.2 × 6.4 = 103.68 |
| 2 Car Attached | 487.2 Sq ft | 23.2 × 20.9 = 484.88 |
| | | 0.5 × 23.2 × 0.2 = 2.32 |

*Ex 5 Pg 18 of 19*

Main File No. 1500 WIMBLEDON CT] Page #17

## Location Map

| Borrower/Client | N/A | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 1500 Wimbledon Ct | | | | | | |
| City | West Covina | County | LOS ANGELES | State | CA | Zip Code | 91791 |
| Lender | N/A | | | | | | |



# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

PO Box 4205, Chatsworth, CA 91313

A true and correct copy of the foregoing document described as **DEBTOR'S NOTICE OF MOTION AND MOTION TO AVOID JUNIOR LIEN ON PRINCIPAL RESIDENCE [11 U.S.C. § 506(d)]**     **AMENDED**  _____

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Order(s) and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On _____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) stated below:

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL OR OVERNIGHT MAIL** (state method for each person or entity served):
On _____, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

| | | |
|---|---|---|
| Honorable Julia W. Brand | Nancy Curry | Manuel Gonzalez |
| U.S. Bankruptcy Court | Chapter 13 Trustee | 1500 Wimbledon Ct. |
| 255 E. Temple St., Ste 1382 | 700 S. Flower, Ste. 1215 | West Covina, CA 91791 |
| Los Angeles, CA 90012 | Los Angeles, CA 90017 | |

☑ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Date: _4/6/2012_____

Signature: _____

Printed Name: _Carrissa M. Villalobos_____

This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2011                                       64                                  **F 4003-2.4.MOTION**

2. **SERVED BY UNITED STATES MAIL, CERTIFIED MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served)**:**

*(Attached page to Proof of Service of Document-please include any additional or alternative addresses and attach additional pages if needed)*

*(Certified Mail required for service on a national bank.)*

| | | |
|---|---|---|
| 1st lienholder *(name and address)*<br>Bank of America, NA<br>Attention: Brian Moyniham (CEO)<br>214 N. Tryon Street<br>Charlotte, NC 28255 | Address from:<br>☐ Proof of claim ☑ Secretary of State<br>☐ FDIC website ☐ Other *(specify)*: | Delivery Method<br>☐ United States mail<br>☑ Certified mail – Tracking #<br>☐ Overnight mail – Tracking #<br>    Carrier Name: |
| 1st lienholder *(name)* and Agent for Service of Process *(name and address)*<br>CT Corporation System<br>818 W. Seventh Street<br>Los Angeles, CA 90017 | Address from:<br>☐ Proof of claim ☑ Secretary of State<br>☐ FDIC website ☐ Other *(specify)*: | Delivery Method<br>☐ United States mail<br>☑ Certified mail – Tracking #<br>☐ Overnight mail – Tracking #<br>    Carrier Name: |
| 1st lienholder *(name)* and Servicing Agent *(name and address)*<br>BAC Home Loan Servicing<br>PO Box 515503<br>Los Angeles, CA 90051-6803 | Address from:<br>☐ Proof of claim ☐ Secretary of State<br>☐ FDIC website ☑ Other *(specify)*:<br><br>bankofamerica.com | Delivery Method<br>☐ United States mail<br>☑ Certified mail – Tracking #<br>☐ Overnight mail – Tracking #<br>    Carrier Name: |

| | | |
|---|---|---|
| 2nd lienholder *(name and address)*<br>Green Tree Servicing LLC<br>1100 Landmark Tower<br>St Paul, MN 55102 | Address from:<br>☐ Proof of claim ☑ Secretary of State<br>☐ FDIC website ☐ Other *(specify)*: | Delivery Method<br>☑ United States mail<br>☐ Certified mail – Tracking #<br>☐ Overnight mail – Tracking #<br>    Carrier Name: |
| 2nd lienholder *(name)* and Agent for Service of Process *(name and address)*<br>CT Corporation System<br>818 W. Seventh Street<br>Los Angeles, CA 90017 | Address from:<br>☐ Proof of claim ☑ Secretary of State<br>☐ FDIC website ☐ Other *(specify)*: | Delivery Method<br>☑ United States mail<br>☐ Certified mail – Tracking #<br>☐ Overnight mail – Tracking #<br>    Carrier Name: |
| 2nd lienholder *(name)* and Servicing Agent *(name and address)*<br>Green Tree Servicing LLC<br>345 St. Peter Street<br>St. Paul, MN 55102 | Address from:<br>☐ Proof of claim ☐ Secretary of State<br>☐ FDIC website ☑ Other *(specify)*:<br><br>GTservicing.com | Delivery Method<br>☑ United States mail<br>☐ Certified mail – Tracking #<br>☐ Overnight mail – Tracking #<br>    Carrier Name: |

This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2011                                                 65                                  **F 4003-2.4.MOTION**